CITY STATE BANK and The Bank of
Sharon, Plaintiffs/Appellants,

v.

DEAN WITTER REYNOLDS, INC., a
Delaware Corporation, and Hank
Franck, Defendants/Appellees.

Court of Appeals of Tennessee,
Western District, at Jackson.

Oct. 15, 1996.

Application for Permission to Appeal
Denied by Supreme Court
April 14, 1997.

Douglas A. Black, Thomas J. Walsh, Jr., Wolff Ardis, P.C., Memphis, for Plaintiffs/Appellants.

Edward M. Kaplan, Nathaniel L. Prosser, Armstrong Allen Prewitt, Gentry Johnston & Holmes, Memphis, for Defendants/Appellees.

HIGHERS, Judge.

This is an interlocutory appeal from the trial court's grant of partial summary judgment in favor of defendants on the basis of the statute of limitations. The primary issue for our determination is whether there exists a genuine issue of material fact with respect to when the plaintiff banks discovered or reasonably should have discovered their cause of action against defendants. We hold that this issue was inappropriate for resolution by summary judgment and, therefore, we reverse the judgment of the court below.

## FACTS

The plaintiffs, City State Bank and The Bank of Sharon, are small community banks located in Weakley County, Tennessee. Both banks are owned by a holding company, Sharon Bancshares, Inc. At all times pertinent hereto, John Clark served as president and chief executive officer of the holding company. He also served as the investment officer for City State Bank. Clark's responsibilities included managing the day-to-day operations of the holding company and making investment decisions for the banks.

Defendant, Hank Franck, is a licensed securities professional who was employed at Duncan Williams, Inc. from 1982 until 1989. While employed at Duncan Williams, Franck sold securities offered by Duncan Williams to Clark. Effective July 3, 1989, Franck resigned from Duncan Williams and began working for defendant Dean Witter Reynolds, Inc., a national securities broker/dealer.

Two days after joining Dean Witter, Franck called Clark in order to solicit the banks' purchase of the "Memphis bonds." Clark described the July 5, 1989, conversation in relevant part as follows:

A. He [Franck] contacted me by telephone.... Some comment about general market conditions, interest rates, and that type of conversation that I had with him then and the, either he asked or I told him that we did have some funds for investment. He offered the securities I purchased that day, which were some of the Memphis securities.

    *       *       *       *       *       *

A. He offered for sale some investments that day. The Memphis bonds or a block of the Memphis bonds.... I questioned him about those bonds....

A. I told him that ... we were a conservative bank, we had to have only, we did not want anything with any credit risk involved. He offered a block of the Mem-

phis bonds. I questioned him about the status of those bonds, the collateral behind them. He indicated that they were secured by mortgages there in the Memphis area. Indicated the, also the guarantee by a large insurance company....

\* \* \* \* \* \*

A. His words clearly indicated that these were Memphis bonds, that these, the primary security for these bonds were mortgages in Memphis, Tennessee.

Clark agreed on behalf of the plaintiff banks to purchase the Memphis bonds for $192,560.00, plus accrued interest. Clark testified that at the conclusion of the conversation, his understanding of the purchase of the Memphis bonds was as follows:

My understanding was that loans had been made in the Memphis area for housing and that the primary source of repayment for these bonds would be from the repayment of those mortgages. I guess a secondary source of repayment would be if the people didn't pay their mortgages, the properties would be sold to repay the bonds. And then I would consider it a third source of collateral was a guarantee by a large insurance company.

On or about July 12, 1989, Franck again called Clark to solicit additional purchases of the Memphis bonds. Clark declined to purchase more Memphis bonds, stating that he did not want to put "too many eggs in one basket." Franck then suggested to Clark that he purchase the "Adams County bonds" and the "Southeast Texas bonds." Franck allegedly stated that the Adams County bonds were used to fund agricultural and commercial development, were collateralized by mortgages, and were guaranteed by a large insurance company. He portrayed the Southeast Texas bonds as housing bonds that would be repaid by mortgages. Clark purchased both the Adams County bonds and the Southeast Texas bonds on behalf of the banks for a total price of $436,045.50, plus accrued interest. In late July 1989, Clark purchased the "El Paso bonds," which Franck stated were housing bonds secured by mortgages and guaranteed by a large insurance company, and more Memphis bonds, for a total price of $679,000.20.

At the time of the July transactions, Clark requested copies of the original prospectuses for each of the bonds. Franck furnished the prospectuses to Clark in November 1989. After receiving the prospectuses, Clark made another purchase of Memphis bonds on November 30, 1989. Although Clark made additional bond purchases, only the July purchases and the November purchase are at issue in this appeal.

On their face, the bonds appeared to be traditional housing or industrial revenue bonds, which are considered to be conservative and relatively low-risk. However, the bond proceeds were not used for the purpose of funding housing projects. Instead, immediately upon the bonds' issuance, all of the proceeds were transferred to Executive Life Insurance Co. of California ("Executive Life"). Executive Life used the bond proceeds to purchase "junk bonds," a high-risk type of security.

On or about January 25, 1990, Clark read an article that stated that Standard and Poor had lowered its credit rating on the subject bonds. The article also stated that the bond proceeds had been invested with Executive Life and had not been used to acquire mortgages. On or about the same date, Clark began receiving reports containing negative information about the bonds. Several articles subsequently appeared in the Memphis newspaper, which disclosed that the bond issuances were not used for their intended purpose, but rather, were invested in Executive Life, which in turn purchased junk bonds.

An article entitled *"Who Got Killed by Executive Life?"* appeared in FORTUNE magazine that described the events surrounding the eventual disclosure of the true nature of the bonds. The article reported:

Hundreds of investors, including charities, retirees, and widows, put $1.85 billion into what they thought were conservative municipal bonds. They were wrong ... issued by public finance authorities in Colorado, Louisiana, Nebraska, Tennessee, and Texas ... these munis were supposed to finance cheap loans to farmers, help developers put up affordable housing for low-

income families, and serve other socially useful purposes.... But virtually all the money raised ... ended up not in low-cost loans but in guaranteed investment contracts ... sold by Executive Life.... Though marketed as a way to help your neighbors and provide a haven for your savings, these munis were never more than junk bonds tarted up in red, white, and blue bunting borrowed from City Hall.... The muni investors are furious. Many say that they had no idea their money was ending up in the Executive Life junk pile until March 1990. That's when S & P finally lowered the ratings on all muni issues to reflect the junk behind them, and the bonds' trading value dropped nearly as fast as the bondholders' jaws .... so far, 18 lawsuits covering all the muni issues have been filed....

Terence P. Pare, *Who Got Killed by Executive Life?* FORTUNE, May 20, 1991, at 110–11.

The plaintiff banks alleged that they lost more than $1.6 million on the bonds. On January 15, 1993, the banks filed a complaint against Dean Witter and Franck, alleging fraud, negligent misrepresentation, negligence, breach of contract, breach of fiduciary duty, and seeking compensatory damages in the amount of $2,404,720.70. The complaint related to 18 transactions. The 11 transactions at issue in this appeal involved the Memphis bonds, the Adams County bonds, the Southeast Texas bonds, and the El Paso bonds. With respect to these four bonds, the plaintiffs alleged that defendants solicited their purchase of the bonds by misrepresenting their status as municipal bonds issued to finance housing and industrial projects, which is a relatively safe form of investment.

Defendants moved for partial summary judgment on the basis that the ten July 1989 purchases were barred by the three-year statute of limitations because plaintiffs reasonably should have discovered their cause of action in November 1989 by virtue of the bond prospectus materials that were given to them. As to the November 1989 purchase, defendants contended that the plaintiffs' reliance on any alleged representation was not reasonable as a matter of law due to the prospectus information in their possession.

To the extent pertinent here, the trial court granted partial summary judgment in favor of defendants as to the July 1989 transactions and the November 1989 transaction. In a letter to both parties' counsel, the trial judge explained his reasons for granting the motion for summary judgment as follows:

> The question for the Court is whether or not it (the particular prospectus) clearly communicated to a person of Mr. Clark's station what it purported to convey.... The Court finds that Plaintiff's claims are barred by the three year statute of limitations for property.... The 'discovery rule' does not save Plaintiff's cause of action because 'the statute is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred *and,* as a reasonable person, was not put on inquiry notice.' (*Potts v. Celotex Corp.,* 796 S.W.2d 678, 680 (Tenn.1990)) (emmphasis [sic] added). Plaintiff was put on inquiry notice when Plaintiff received the prospectuses for each of the bond investments on November 28, 1989. Plaintiff had the knowledge at hand in the form of the prospectuses to determine whether Defendant Franck's statements conflicted with disclosures in the prospectuses.

It is from this judgment that plaintiffs appeal.

## ISSUES

Plaintiffs have raised the following issues for our consideration: (1) whether the trial court erred in granting defendants' motion for summary judgment on the issue of whether plaintiffs exercised reasonable diligence to discover their cause of action; (2) whether the trial court erred in granting summary judgment on the issue of whether plaintiffs reasonably relied on defendants' representations; (3) whether the trial court erred in dismissing plaintiffs' complaint *sua sponte* on grounds that it failed to plead fraud with particularity; and (4) whether the trial court erred in refusing to allow the banks to complete discovery.

We will not address plaintiffs' fourth issue regarding discovery, as we have elected to

reverse the judgment below on alternate grounds.

## STANDARD OF REVIEW

Our review of a trial court's grant or denial of a motion for summary judgment is *de novo*, with no accompanying presumption of correctness. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995).

Pursuant to Tenn.R.Civ.P. 56, summary judgment is proper when the pleadings, affidavits, depositions, or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn.1993). As summarized by the Tennessee Supreme Court in *Carvell*:

> [S]ummary judgment is only appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion; and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts.

900 S.W.2d at 26 (internal citations omitted).

In assessing the sufficiency of the evidence for purposes of determining the propriety of a motion for summary judgment, this court must view the evidence in a light most favorable to the non-moving party and draw all inferences from factual averments in favor of the non-moving party. *Id.* The Court in *Byrd* acknowledged the utility of the summary judgment procedure, but cautioned that:

> [a]ppropriate application of the Rule is more likely to be achieved if litigants and courts alike keep in mind that the purpose of a summary judgment proceeding is not the finding of facts, the resolution of disputed material facts, or the determination of conflicting inferences reasonably to be drawn from these facts. 'The purpose is to resolve controlling issues of law, and that alone.'

*Id.* at 216 (quoting *Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 33 (Tenn.1988)).

## POSITIONS OF THE PARTIES

The plaintiffs' primary contention is that the issues in the case *sub judice* are inherently factual and are, therefore, inappropriate for resolution by summary judgment. Whether the banks reasonably should have discovered their cause of action and whether their reliance on defendants' representations was reasonable should be resolved by the trier of fact.

Conversely, defendants argue that the prospectuses sent to plaintiffs in November 1989 evinced a clear conflict between Franck's alleged oral representations and the prospectuses. According to defendants, this conflict operated to put plaintiffs on inquiry notice regarding the July purchases and to negate any element of reasonable reliance as to the November 30, 1989 purchase. Because plaintiffs did not file suit until January 15, 1993, the three-year statute of limitations bars plaintiffs' claims.

Defendants assert that the prospectuses expressly stated that large percentages of each bond would be invested with Executive Life. Defendants have directed us to the following excerpts from the prospectuses:

> From the Adams County Bond prospectus: Use of bond proceeds: .... The balance of the net proceeds of the bonds will be used to make a $150,000.00 deposit to the Bond Service Reserve Fund.
>
> \* \* \* \* \* \*
>
> Security for the bonds: .... Pending disbursement, if any, of Bond proceeds ... payment of principal of and interest on the Bonds will be payable solely from moneys derived from the guaranteed investment contract purchased from Executive Life Insurance Company.... (Appendix to Appellants' Brief p. 103)
>
> From the El Paso Bond prospectus: Use of Bond Proceeds ... The net proceeds of the Bonds will be (1) deposited in an Investment Agreement and Single Funding Deposit Agreement (the 'Investment Agreement') with Executive Life Insurance Company (the 'Investment Agreement Provider') and will be available to be used (i) to make Mortgage Loans to finance multifamily housing, and (ii) to enter

into certain Repurchase Obligations, (2) used to fund a Bond Service Reserve Fund in an amount equal to the Required Reserve....

In support of their position that the prospectuses should not be deemed to have placed them on inquiry notice, plaintiffs point out that the first page of the Memphis Bond prospectus provides in part:

**8.68% Securitized Multifamily Housing Revenue Bonds**

\* \* \* \* \* \*

The Bonds are being issued by The Health, Educational and Housing Facility Board of the City of Memphis, Tennessee (a) to provide funds to purchase ... certain Mortgage Purchase Agreements ... from mortgage lending institutions certain mortgage loans (the "Mortgage loans") made to finance or refinance multifamily housing facilities for persons of low and/or moderate income, and/or elderly persons, and/or handicapped persons (individually, each "Project", collectively, the "Projects") in Tennessee, with each Mortgage Loan being secured either by a separate letter of credit ... effectively guarantying payment of all principal of and interest on such Mortgage Loan ... (b) to provide funds to enter into certain repurchase obligations ... with certain national banks, with the Bond proceeds received by such banks being used by the banks to make Mortgage Loans to finance or refinance Projects and ... make deposits to certain funds, including a Bond Service Reserve Fund ...

Similarly, the prospectus for the Southeast Texas Bonds is entitled:

**8.6% Securitized Multifamily Housing Revenue Bonds**

\* \* \* \* \* \*

The Bonds are being issued by The Southeast Texas Housing Finance Corporation ... (a) to make direct loans to developers for the purpose of financing the acquisition, construction, improvement and equipping of, or the refinancing of mortgage loans on, certain multifamily rental housing facilities ... which are intended for occupancy by persons of low or moderate income ... and the payment of principal

and interest on each of such Multifamily Mortgage Loans shall be secured either by a separate letter of credit ... or a guaranty ... issued by a financial institution ... (b) to provide funds to enter in to certain repurchase agreements ... with certain financial institutions, with the Bond proceeds received by such financial institutions being used to fund certain mortgage loans made for the purpose of financing the acquisition, construction, improvement and equipping of, or the refinancing of mortgage loans on certain multifamily rental housing facilities ... (c) to fund a Bond Service Reserve Fund, and (d) to pay the costs of issuing the Bonds....

The Adams County, Colorado bond prospectus provides:

**9% Industrial Development Revenue Bonds**

\* \* \* \* \* \*

The Bonds are being issued by Adams County, Colorado ... to provide funds to make loans ... to certain agricultural, manufacturing, industrial, commercial or business enterprises pursuant to certain Loan Agreements ... to finance any land, building or other improvement and real or personal properties suitable or used for or in connection with any manufacturing, industrial, commercial, agricultural or business enterprise ... in Adams County, Colorado, with each Loan being secured either by a separate letter of credit ... or, under ... a guaranty ... effectively guarantying payment of all principal of and interest on such Loan....

Finally, the first page of the El Paso prospectus describes the bonds as follows:

**8.88% SECURITIZED MULTIFAMILY HOUSING REVENUE BONDS**

\* \* \* \* \* \*

The Bonds are being issued by El Paso Housing Finance Corporation ... (a) to provide funds to make mortgage loans ... to certain developers pursuant to certain Loan Agreements ... to finance or refinance multifamily residential rental developments for persons of low or moderate income ... in the City of El Paso, Texas,

with each Mortgage Loan being secured either by a separate letter of credit ... or a guaranty ... effectively guaranteeing payment of all principal of and interest on such Mortgage Loan....

Our task is to examine the record in order to determine whether there exists an issue of material fact as to: (1) whether the prospectuses should have placed plaintiffs on inquiry notice of their cause of action, and (2) whether there existed a sufficient conflict between the alleged oral representations and the prospectuses to place plaintiffs on inquiry notice.

### STATUTE OF LIMITATIONS

■ The parties concede that the three-year statute of limitations for property torts applies to the present case. T.C.A. § 28–3–105 (Supp.1995). A cause of action accrues under the statute when a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof. *Potts v. Celotex Corp.*, 796 S.W.2d 678 (Tenn.1990). The statute is tolled only during that period of time when the plaintiff had no actual knowledge of the wrong and, as a reasonable person, was not placed on inquiry notice. *Id.* at 680–81. Ordinarily, the question of whether a plaintiff knew or should have known that a cause of action existed is a question of fact, inappropriate for summary judgment. *Prescott v. Adams*, 627 S.W.2d 134, 139 (Tenn.App. 1981).

Although Tennessee cases have held to the contrary, there is ample authority for the proposition that whether a plaintiff discovered, or in the exercise of reasonable diligence, should have discovered an injury resulting from a defendant's act creates a genuine issue of fact, precluding disposition by summary judgment. *Caledonia Leasing and Equip. Co. v. Armstrong, Allen, Braden, Goodman, McBride & Prewitt*, 865 S.W.2d 10, 18 (Tenn.App.1992); *Nat'l Mortgage Co. v. Washington*, 744 S.W.2d 574, 580 (Tenn. App.1987); *Gosnell v. Ashland Chem. Inc.*, 674 S.W.2d 737, 739 (Tenn.App.1984). As the court stated in *National Mortgage*, "Whether any kind of behavior conforms to a legal standard of reasonable conduct is a mere fact question for the jury, and not a question of law." 774 S.W.2d at 580. Similarly, this court stated in *Hathaway v. Middle Tennessee Anesthesiology, P.C.*, 724 S.W.2d 355 (Tenn.App.1986), "The question of whether due diligence under the circumstances required ... any other particular form of investigation is properly a question for the trier of fact after hearing all of the evidence, rather than a question of law to be determined by summary judgment based upon the ... record." *Id.* at 360.

■ In determining whether the prospectuses would have alerted a reasonable investor to problems with the bonds, the prospectuses must be examined as a whole, rather than in a selective fashion. The pertinent inquiry is not whether a particular statement, taken separately, would have alerted a reasonable investor, but whether the prospectuses, taken in the aggregate and in context, would have triggered a duty of inquiry on the part of a reasonable investor.

In opposition to defendants' motion for summary judgment, plaintiffs proffered the affidavit of Samuel Lee Bowman, III, a licensed securities professional, in which Bowman stated that the prospectuses would not have placed a reasonable investor on notice that the bonds were not what they appeared to be. As herein relevant, Bowman stated:

7. In my experience commercial bankers, and especially those who serve in community banks, rarely qualify as sophisticated investors. Typically, an officer in a community bank is responsible for multiple functions of the bank; therefore, it is simply not possible for a typical community banker to gather enough information to manage a bank's investment portfolio without relying on advice and information supplied by securities brokers/dealers, such as Dean Witter Reynolds, Inc. Based on my knowledge and experience, commercial bankers are not generally capable of establishing a market level at which a security is fairly priced, and cannot, on their own, reasonably discern the material risks of a particular security without the aid of an investment professional. In my expert opinion, based on my review of the deposition testimony of John C. Clark, Mr [sic] Clark is a typical community banker.

8. The absence of sophistication on the part of commercial bankers was particularly evident with respect to the type bonds at issue in this case, that is, taxable municipal bond issues supported by guaranteed insurance contracts (GICS). To my knowledge, these securities first appeared on the market in or about 1986. These securities were not well known to the investing public, and on their face, they appeared to the reasonable investor to be another, familiar type of security—the housing or industrial revenue bond.

9. Because the taxable municipal bonds are that the subject of this case, including the bonds referred to in this action as: The Memphis Bonds, The Adams County Bonds, The Southeastern HFC Bonds and The El Paso Bonds were issued through public facility agencies, they appeared to be similar to tax-free issues well known to the public; the latter were structured for legitimate public purposes such as to generate loans for housing, agricultural and industrial projects. However, as indicated, **the municipal bonds at issue in this case were not as they appeared to a reasonable investor, even were that reasonable investor to review the prospectuses that were issued in connection therewith.** Rather than being issued for legitimate public purposes, primarily for the making of loans for housing projects and/or agricultural or industrial enterprises, it is highly unlikely that these bonds could have generated loans for any purpose, due to considerations of economic feasibility.

10. By 1988 it was widely known among professionals in the securities industry, though not to reasonable investors in the public at large, that these taxable municipal bond issues were being used to funnel monies to Executive Life Insurance Company for the purpose of buying "junk bonds," an extremely high risk form of security. By 1988 securities broker/dealers who sold these bonds knew or should have known that Executive Life Insurance Company was a junk bond player, a fact which reasonable investors, including community bankers, did not generally know and would not reasonably know.

**11. Nothing which I have seen in any of the prospectuses prepared in connection with these bond issues made any reference to the purchase of junk bonds or to the permanent diversion of the majority of the bond funds from a legitimate public purpose to another purpose, and nothing in the prospectuses would have put a reasonable investor on notice that further inquiry should be made, or would lead a reasonable investor to suspect that these bonds were not what they appeared to be.** The fact that these bonds were not what they appeared to be, and that bond funds had been diverted for use in the purchase of high-risk junk bonds, did not become general public knowledge until in or about February 1990. (emphasis added)

Defendants assert that the Bowman affidavit is insufficient to create a genuine issue of material fact for two reasons. First, defendants argue, Bowman's affidavit does not address the conflict between the prospectuses and Clark's understanding of Franck's alleged misrepresentations. Consequently, they argue, the affidavit is irrelevant to the case at bar. We disagree. Whether the prospectuses would have placed a reasonable investor on notice that the bonds were not what they appeared to be is highly relevant to the present case.

■ Second, defendants assert that the opinions contained in the affidavit are legal opinions and are, therefore, incompetent. In this regard, we recognize the general rule that an expert affiant may not give legal opinions, and such opinions are insufficient to create a genuine issue of fact. However, we find that Bowman's opinion that a reasonable investor would not have been put on notice is a factual opinion, rather than an impermissible legal opinion.

Plaintiffs also submitted the affidavit of Clark, in which he stated that:

I reviewed the prospectuses which Mr. Franck sent me on these bond issues. While I am not a professional investor, in the course of my work I have had occasion to review prospectuses on municipal bond issues. The documents which Mr. Franck sent to me appeared to be in standard

form with typical provisions for issues of this nature. They also appear to confirm what Mr. Franck had represented to me about each of the bond issues. As I read them, nothing in the prospectuses contradicted what he had said or caused me to be suspicious or to make further inquiry as to these bonds.... As indicated, the prospectus on the Memphis bonds confirmed each of the major points which Mr. Franck had made in my conversation with him. I saw nothing in the prospectus that was inconsistent with his oral representations.... I did not become aware of any facts which put me on notice of a potential problem with these bonds or of Mr. Franck's misrepresentations until late January 1990....

\* \* \* \* \* \*

The prospectus contained a reference to a 'Bond Service Reserve Fund.' Sometimes referred to in bond prospectuses as a 'debt service reserve fund,' in my experience this is a customary feature in such issues whereby a reserve fund is maintained in order to service debt payments to bondholders in the event revenue from the underlying project is not sufficient, particularly while the project is under construction. Such reserve funds are normally invested in conservative, high-quality securities such as government bonds. Such a reserve fund thus serves to protect the interest of the bondholders. For that reason, far from causing me to be alarmed, that provision in the prospectus gave me added assurance that this was a safe, high quality investment.

Based upon Clark's affidavit, we cannot say that there is no genuine issue of fact as to whether any alleged conflict between Franck's oral representations and the prospectuses was sufficient to place plaintiff on inquiry notice.

In short, Clark's affidavit establishes that plaintiffs did not discover their cause of action until late January 1990. Bowman's affidavit establishes that plaintiffs reasonably could not be expected to have discovered their cause of action before that time.

Viewing the evidence in a light most favorable to plaintiffs, it appears that there is a genuine issue of fact on the question of whether the prospectuses should have placed plaintiffs on inquiry notice of their injury. It simply cannot be said with legal certainty that the prospectuses presented a glaringly obvious red flag that, as a matter of law, should have given plaintiff notice of the intended uses of the bond proceeds. Similarly, it is for the fact-finder to determine the degree of inconsistency between the oral representations and the prospectus materials, and whether such inconsistency should have placed plaintiffs on notice of the possibility of fraud.

## REASONABLE RELIANCE

■ The second issue that plaintiffs have presented for our consideration is whether the trial court erred in granting summary judgment as to the November 1989 bond purchase on grounds that plaintiffs' reliance upon defendants' alleged representations was unreasonable. Whether a plaintiff's reliance on alleged misstatements is reasonable is also generally a question of fact inappropriate for summary judgment. *See, e.g., Nichols v. A.B. Colemans, Inc.*, 652 S.W.2d 907 (Tenn.App.1983); *Marine Midland Bank, N.A. v. G.M.A.C.*, No. 03A01–9502–CV–00060, 1995 WL 417047, (Tenn.App. July 17, 1995).

■ The law of misrepresentation requires a fact-finder to take into account the specific situation of a plaintiff in evaluating the reasonableness of reliance. When determining the reasonableness of an investor's reliance on a broker's representations, the trier of fact should consider facts and circumstances such as:

(1) the investor's sophistication and expertise in financial and securities matters, (2) the existence of longstanding business or personal relationships between the parties, (3) the availability of the relevant information, (4) the existence of a fiduciary relationship, (5) the concealment of the fraud, (6) the opportunity to discover the fraud, (7) which party initiated the transaction, and (8) the specificity of the misrepresentations.

*Dean Witter Reynolds, Inc. v. M.C. McCoy,* No. 94–5–779, 1995 WL 699619 (6th Cir. Nov.27, 1995) (Moore, J., dissenting).

Plaintiffs have produced evidence creating a genuine issue of material fact as to whether it was reasonable for plaintiffs to have relied on defendants' alleged misrepresentations. Taking the evidence in a light most favorable to plaintiffs, we cannot say that plaintiffs' reliance on defendants' alleged representations was unreasonable as a matter of law. We therefore reverse the trial court's entry of summary judgment as to the November 1989 transaction.

## FRAUD

■ Plaintiffs' third contention on appeal is that the trial court erred in dismissing their case on grounds that they failed to plead fraud with particularity. In his letter explaining his reasons for granting defendants' motion for summary judgment, the trial judge stated in the last paragraph:

> The Court finds that Plaintiff has not met his burden of pleading with particularity the circumstances constituting the fraud or mistake of Defendant. Because the Plaintiff's [sic] filed their complaint on January 15, 1993, and the prospectuses were received by Plaintiff on November 28, 1989, Plaintiff's cause of action is time barred.

Defendants argue that plaintiffs misconstrued the basis of the trial court's dismissal. Defendants interpret the trial court's letter to mean that plaintiffs failed to set forth sufficient allegations supporting a claim for fraudulent concealment that would operate to toll the statute of limitations.

■ If defendants are correct in their interpretation of the trial court's statements, then we agree that plaintiffs failed sufficiently to allege facts supporting a claim for fraudulent concealment. In order for the statute of limitations to be tolled due to fraudulent concealment, a plaintiff must allege that defendant knew of the cause of action and fraudulently concealed such information. *Ray v. Scheibert,* 224 Tenn. 99, 450 S.W.2d 578, 580 (1969). Tenn.R.Civ.P. 9.02 requires that in pleadings averring fraud, the circumstances constituting fraud must be pled with particularity. The plaintiffs' complaint simply does not allege fraudulent concealment.

However, to the extent that the trial court attempted to dismiss plaintiffs' case for failure to plead fraud with particularity, we reverse. Although fraud must be pled with particularity, the Committee Comments to Tenn.R.Civ.P. 9.02 explain that:

> [t]he requirement ... is not intended to require lengthy recital of detail. Rather, the Rule means only that general allegations of fraud and mistake are insufficient; the pleader is required to particularize but by the 'short and plain' statement required by Rule 8.01.

■ In an action for fraudulent misrepresentation, a plaintiff must show: (1) that the defendant made a representation of fact; (2) that the representation was false; (3) the representation related to a material fact; (4) the representation was made either knowingly, recklessly, or without belief in its truth; (5) that plaintiff acted reasonably in relying on the representation; and (6) that plaintiff suffered damage as a result of the representation. *Metro Gov't. of Nashville & Davidson County v. McKinney,* 852 S.W.2d 233, 237 (Tenn.App.1992).

Plaintiffs' complaint specifically identifies the time and place of each alleged false representation, and identifies the manner in which each representation was deemed to have been fraudulent. The plaintiffs' complaint contains allegations concerning each of the above requisites comprising an action for fraud. In our opinion, therefore, the complaint fully complies with Rule 9.02.

## CONCLUSION

Our review of the record convinces us that genuine issues of fact remain, rendering inappropriate the trial court's entry of summary judgment based upon the expiration of the statute of limitations. Therefore, because there exist genuine issues of material fact as to whether plaintiffs should have discovered their cause of action, and as to whether their reliance upon defendants' representations was reasonable, summary judgment based upon the statute of limitations is

precluded. The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion. Costs on appeal are adjudged against defendants.

CRAWFORD, P.J. (W.S.), and PAUL G. SUMMERS, Special Judge, concur.