IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2002 Session

## STRATEGIC CAPITAL RESOURCES, INC., ET AL. v. DYLAN TIRE INDUSTRIES, LLC, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 00-1296-III      Ellen Hobbs Lyle, Chancellor**

_____

**No. M2001-00790-COA-R3-CV - Filed July 9, 2002**

_____

Strategic Capital Resources, Inc. and FPE Funding, LLC sued the buyer and seller of the Pirelli tire plant in Nashville and other parties involved in structuring and financing the transaction. The complaint alleged that the buyer and seller breached an agreement with Strategic, and that other parties were guilty of fraud, inducement of breach of contract, conspiracy, and had been unjustly enriched at the expense of Strategic.. The Chancery Court of Davidson County granted the defendants' Tenn. R. Civ. P. 12.06 motion to dismiss because Strategic's contract with the buyers did not bind the buyer to deal exclusively with Strategic. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J. and DON R. ASH, SP. J., joined.

Robert C. Goodrich, Jr. and Ronald G. Steen, Jr., Nashville, Tennessee, for the appellants, Strategic Capital Resources, Inc. and FPE Funding, LLC.

C. Brooks Wood and Erik P. Klinkenborg, Kansas City, Missouri, and Robb S. Harvey, Nashville, Tennessee, for the appellees, Dylan Tire Industries, LLC and Dylan Custom Mixing, LLC.

Thomas Lawrence Stewart, Charles W. Cook, III, and Mark A. Bogdanowicz, Nashville, Tennessee, for the appellee GMAC Commercial Credit LLC.

Blakeley D. Matthews, Nashville, Tennessee, for the appellee, Pirelli Tire LLC.

# OPINION

## I.

The following facts are taken from the plaintiffs' first amended complaint and the exhibits thereto.

In August of 1998, Pirelli Tire LLC agreed to sell its manufacturing plant in Nashville to Dylan Tire Industries, LLC, a Missouri limited liability company. Closing was to occur sixty days after Pirelli furnished to Dylan all the documents specified in the contract. The complaint alleges, however, that as late as the Spring of 1999 Dylan was unable to close the purchase because it could not finance it.

Dylan contacted the plaintiff, Strategic Capital Resources, Inc., to explore Strategic's willingness to provide the required financing. On July 9, 1999, Strategic issued a commitment to Dylan and to Mid-American Tire and Machine, LLC in which Strategic agreed to finance a transaction structured so that the property would be purchased by an entity created by Strategic; the purchasing entity would then lease the property to Dylan and Mid-American for a term of five years under a "Triple Net," "Full Payout," "Hell or High-Water" lease. The agreement called for lease payments to be guaranteed by some of the principals of Dylan and/or Mid-American and bonded by "Frontier/Lyndon and NACRE Corporation." If the closing did not take place by July 31, 1999, Strategic's obligations would terminate and it would retain the commitment fee of $153,750 (½ of the total fee) as liquidated damages.

Strategic formed an entity called FPE Funding, LLC to be the purchaser/lessor of the property. The transaction did not close by July 31, 1999, but on or about August 31, 1999, Pirelli, Dylan, and Strategic executed an agreement extending the closing date for the transaction to October 15, 1999. Strategic agreed to pay Pirelli $100,000 for the extension and the extension agreement provided that if the transaction closed on or before October 15, Dylan would receive a $100,000 credit on the purchase price. Otherwise Pirelli could keep the $100,000. The extension agreement reflected that Strategic and Dylan were awaiting approval of a loan from an outside source. If they failed to secure the loan by September 10, 1999, Dylan would be in default, allowing Pirelli to terminate the sales agreement and retain the earnest money, extension fees, and other deposits made by Dylan, its agents, or affiliates. Strategic's obligation to Pirelli was specifically restricted to the payment of the $100,000 extension fee.

The complaint alleges that Strategic paid the $100,000 to Pirelli at the request of Dylan/ Mid-American, or of the individual principals connected to them, or of some combination of them. In addition, the plaintiffs allege that Dylan and one of the individual defendants, Feingold, agreed to reimburse Strategic $50,000 of the advance to Pirelli. In any event, an indemnity agreement executed by Dylan and Feingold on September 2, 1999, provided for the $50,000 repayment and allowed Strategic to recover all of its out-of-pocket expenses. Strategic was referred to in the indemnity agreement as "merely a prospective assignee of the Purchase Agreement."

-2-

Strategic had by September opened negotiations with General Motors Acceptance Corporation Commercial Credit LLC (GMACCC) to fund the transaction. After Strategic paid GMACCC a $50,000 fee, GMACCC, on September 28, 1999, issued two commitment letters, one for $20,500,000 and another for up to $2,000,000. Under the $20,500,000 commitment GMACCC would loan FPE the funds to purchase the property from Pirelli and FPE in turn would lease it to Dylan/Mid-American. GMACCC also required a performance bond, which the parties proposed to furnish from Frontier Insurance Group. Strategic accepted the terms of the commitment on October 5, 1999, which bound GMACCC to keep the commitment open for ninety days.

Early in November, Dylan, Pirelli, and Strategic executed a tenth extension to the purchase agreement, extending the closing date to November 19, 1999. The parties began preparing and circulating the closing documents, but just before the closing, Frontier's rating was downgraded and GMACCC refused to accept the Frontier bonds. Although Strategic made efforts to obtain a replacement bonding company, the other parties had agreed to close the transaction without Strategic or FPE's participation by December 4, 1999. In a series of secret communications, the defendants allegedly conspired to deprive Strategic and FPE of the benefits of the transaction. The secret plan came to fruition on February 28, 2000 when, using funds advanced by GMACCC, Dylan Custom, a newly-formed company, purchased the facility and leased it to Dylan and/or Mid-American. On April 25, 2000, Strategic and FPE filed this action seeking damages, on various theories, from each of the defendants.

The claims asserted in the complaint can best be dealt with by first analyzing the relief sought rather than the various causes of action alleged. The complaint seeks to recover damages in the following amounts:

(1) The value of the benefit of the bargain with Dylan/Mid-American, including,
  (a) a stream of income flowing to FPE derived from the difference between the lease payments and the costs of the monthly debt service paid to GMACCC;
  (b) the value of an interest in Dylan in an undetermined amount of 2% to 10%.
  (c) the remainder of the commitment fee ($153,750) to be paid at the closing of the original transaction.
(2) Treble damages from the defendants that induced the breach of the agreement with Dylan/Mid-American.
(3) From all defendants, the loss of the above benefit of the bargain with Dylan/Mid-American resulting from an illegal conspiracy to deprive the plaintiffs of that benefit.
(4) From GMACCC, the loss of the above benefit of the bargain with Dylan/Mid-American, resulting from GMACCC's breach of their commitment to the plaintiffs.
(5) Treble damages from the defendants that induced the breach of the GMACCC commitment.

(6)   Damages in an unspecified amount from "the defendants" for their fraud in misrepresenting the fact that the plaintiffs were still involved in the transaction when they had in fact been cut out.

(7)   All legal and out-of-pocket expenses related to the proposed transaction pursuant to the indemnity agreement with Dylan on September 2, 1999.

(8)   Damages in an unspecified amount for Pirelli's breach of an alleged agreement to sell the property to FPE.

(9)   Treble damages from the defendants that induced Pirelli to breach an alleged agreement to convey the property to FPE.

(10)  The value of the benefits conferred on all the defendants by the plaintiffs which it would be unjust for the defendants to keep without compensating the plaintiffs.

(11)  Punitive damages from all "defendants."

(12)  Prejudgment interest on any recovery from and after February 28, 2000.

In addition, the plaintiffs seek the following specific relief: Specific performance of the alleged agreement with Pirelli to convey the property to FPE. In lieu of specific performance, an order divesting title from the current title holder and vesting it in FPE.

## II.

The defendants challenged the allegations of the complaint with motions to dismiss under Rule 12.02(6) of the Tennessee Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. In ruling on a 12.02(6) motion, the court must take the factual allegations in the complaint as true, *Dobbs v. Guenther*, 846 S.W.2d 270 (Tenn. Ct. App. 1992) and give the complaint a liberal construction, *Waller v. Bryan*, 16 S.W.3d 770 (Tenn. Ct. App. 1999). But factual inferences and legal conclusions are not taken as true, *Elliott v. Dollar Gen. Corp.*, 475 S.W.2d 651 (Tenn. 1971), and allegations in a complaint as to the meaning and interpretation of written contracts are not admitted by a 12.02(6) motion. *Oman Const. Co. v. Tennessee Cent. Ry. Co.*, 370 S.W.2d 563 (Tenn. 1963). In addition, Rule 10.03, Tenn. R. Civ. P., requires that whenever a claim is founded upon a written instrument, a copy of that instrument shall, with certain immaterial exceptions, be attached to the pleading as an exhibit.

## III.

As the analysis of the various claims shows, most of the claims depend on two alleged contractual obligations: (1) the obligation of Dylan/Mid-American to close the deal structured by Strategic, and (2) the obligation of Pirelli to sell the property to FPE.

### a.  THE STRATEGIC/DYLAN AGREEMENT

The critical provisions of the July 1998 agreement between Strategic and Dylan/Mid-American are contained in the first and last paragraphs, which are as follows:

Strategic Capital Resources, Inc. ("Lessor") issues this non-assignable commitment to Mid-American Tire & Machine, LLC and Dylan Tire Industries, LLC Kansas Limited Liability Corporations ("Co-Lessees"). This commitment is for a Purchase and Leaseback Facility in an amount of $20,500,000.00 ("Purchase and Leaseback") and is issued subject to those terms and conditions outlined below.

. . . .

If the terms and conditions of this Commitment are satisfactory, please indicate your approval and acceptance by signing and returning the original of this commitment on or before the Commitment Expiration Date, together with the commitment fee of $153,750.00, representing one half of the total commitment fee of $307,500.00, the remainder being earned and owing at closing. If Co-Lessees duly accepts this commitment and the purchase and Leaseback Facility is not closed on or before the Purchase and Leaseback Closing Deadline set forth above, this commitment shall expire, Lessor's obligations hereunder shall terminate, and any commitment fee paid by Co-Lessees shall be retained as liquidated damages for Lessor's services to date. This commitment is made exclusively to the named Co-Lessees and may not be sold, assigned or transferred or shown to third parties without Lessors prior approval.

The pages between these two paragraphs contain a description of the property and the terms of the sale-leaseback once the sale had been finalized. But notably absent from the commitment is a promise by Dylan/Mid-American to accept the financing furnished by Strategic or to deal exclusively with Strategic. The last paragraph of the commitment recognizes that the deal may not close. In that event Strategic would be entitled to keep the $153,750 paid in advance on the commitment fee.

The plaintiffs rely on two federal district court cases, *Teachers Insurance & Annuity of American v. Butler*, 626 F. Supp. 1229 (S.D.N.Y. 1986) and *Teachers Insurance & Annuity Association of America v. Tribune Company*, 670 F. Supp. 491 (S.D.N.Y. 1987), for the proposition that a loan commitment at some point becomes a binding obligation on the part of the borrower to actually borrow the funds. In the first case, however, the court recites that "Teachers agreed to lend and OCCA agreed to borrow $20,000,000 for a thirty-five year term . . . ." 626 F. Supp. At 1230. In the second case, the commitment which the borrower signed contained this language: [Upon acceptance by you] "our agreement to purchase from you and your agreement to issue, sell and deliver to us . . . the captioned securities shall become a binding agreement between us." 670 F. Supp. at 494. Strategic's commitment letter did not contain an equivalent promise on the part of Dylan/Mid-American.

We think the commitment was simply a unilateral promise to help finance the sale of the plant to Dylan.[1] It did not bind Dylan nor Mid-American to go through with the transaction on Strategic's terms. They were free to accept a better deal if they found one. For that flexibility they

---

[1]In fact the Strategic commitment was a promise to furnish financing, not a promise to help find financing as it ultimately did from GMACCC. Thus, Strategic never was able to perform its obligation under its commitment.

paid a price, a $153,000 fee that was fully earned and non-refundable the day they signed the commitment. In a case with similar facts, the California Court of Appeals said:

> It nowhere bound the plaintiffs' assignor to perform the conditions precedent to the company's obligation to furnish funds, or to solely rely on the company as the source of funds if the project was completed. In such event if a take-out loan on more favorable terms had been available from another lender, the developer was free to take such a loan, subject only to the loss of the stand-by deposit.

*Lowe v. Massachusetts Mutual Life Ins. Co.*, 127 Cal. Reptr. 23, 26 (Cal. App. 1976).

### b. PIRELLI'S OBLIGATION TO SELL TO STRATEGIC/FPE

In Count II of the amended complaint the plaintiffs allege that Pirelli breached its contractual obligation to sell the property to FPE. The allegation is based on a theory that the original contract of sale has been assigned to Strategic or FPE. The original contract of sale, however, requires that any assignment by the buyer must be approved by Pirelli in writing. The record does not contain an assignment, nor does it appear that Pirelli's consent was ever sought for an assignment.

The plaintiffs also make the point that an enforceable contract for the sale of real estate may also be constructed from several documents, one of which contains the signature of the seller. *See Yates v. Skaggs*, 213 S.W.2d 41 (Tenn. 1948). This rule follows from two related rules: (1) it is not necessary that the contract be contained in a single document, *Blair v. Snodgrass*, 33 Tenn. 1 (1853); and (2) it is not essential that the party to be charged should have signed each paper forming a link in the chain of evidence, *Williams v. Buntin*, 4 Tenn. App. 340 (1927). But the chain must be established within the documents themselves without resort to parol evidence. *Johnson v. Haynes*, 532 S.W.2d 561 (Tenn. Ct. App. 1975).

There is nothing in this record that satisfies that requirement. In fact, as late as September 2, 1999, Strategic was disclaiming any right/obligation to purchase the facility. The indemnity agreement that was signed contemporaneously with the ninth extension agreement contains this paragraph:

> 2. Indemnitor expressly acknowledges and agrees that Strategic is merely a prospective assignee of the Purchase Agreement and that neither Strategic nor any of its managers, members, directors, officers, employees, agents, partners, lenders, or successors and assigns (collectively, the "Indemnities") are a co-venturer with Indemnitor or have any liability or obligations of any kind with respect to the Purchase Agreement, the Seller or the Property, not withstanding the payment of the Extension Fee. Indemnitor further expressly acknowledges and agrees that the Indemnities shall have no responsibility to Indemnitor if the closing does not occur under the Purchase Agreement and Indemnitor forfeits to the Seller its Earnest Money (as defined in the Purchase Agreement) or the Extension Payment.

The plaintiffs seek to avoid the statute of frauds problem by alleging that the defendants (Pirelli and Dylan) should be compelled to consent to the assignment by estoppel. *See Baliles v. Cities Service*, 578 S.W.2d 621 (Tenn. 1979). But an estoppel is available only to protect a right, never to create one. *Bank of Maryville v. Topping*, 393 S.W.2d 280 (Tenn. 1965); *E.K. Hardison Seed Co. v. Continental Cas. Co.*, 410 S.W.2d 729 (Tenn. Ct. App. 1966). Therefore, the complaint does not allege a mutually binding obligation to sell the property to FPE.

## IV.

Without a contract that bound Dylan/Mid-American to accept the Strategic commitment, nor a contract to buy the Pirelli plant, the plaintiffs do not have a claim for damages for a breach of those contracts.[2] It also follows that none of the defendants can be held responsible for inducing a breach of either alleged agreement. The conspiracy claim also must fail because it was based on an alleged conspiracy to deprive the plaintiffs of the benefit of the bargain of the Strategic commitment. A civil conspiracy is a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Kirksey v. Overton Pub., Inc.*, 739 S.W.2d 230 at 236 (Tenn. Ct. App., 1987). If the plaintiffs' claim for a breach of the commitment fails, then the conspiracy claim must also fail. *Forrester v. Stockstill*, 869 S.W.2d 328 (Tenn. 1994).

The claims for specific relief must also be dismissed since there is no contract by which FPE could acquire the title to the property.

## V.

The claims against GMACCC require a closer analysis, since the plaintiffs have alleged that they had a binding commitment with GMACCC that by its terms did not expire until January 3, 2000. They also allege that the closing date was extended to February 28, 2000 and that suitable

---

[2]After oral argument in this case, the plaintiffs/appellants sent this court a letter, advising it of the existence of supplemental authority that it believed might bear upon our decision. *See* Rule 27(d), Tenn. R. App. P. The supplemental authority was a recent (and as yet unpublished) opinion by the Tennessee Supreme Court styled *Trau-Med of America, Inc. v. Allstate Insurance Company, et al.,* No. W1999-01524-SC-R11-CV.

In that opinion, our Supreme Court for the first time expressly adopted the tort of intentional interference with business relationships, and set out the elements of the tort. The Court held that a party can be held liable for intentionally interfering with a business relationship, even if the relationship is not based upon contract, if the defendant's conduct was actuated by improper motive or if it employed improper means.

In the present case, the plaintiffs brought claims against the defendants for intentionally interfering with contractual relationships. There does not appear to be anything in the record to indicate a business relationship between the parties outside of the contracts we have been called upon to construe. We do not believe that our holding that the obligations of the defendants under the disputed contracts are not as broad as the plaintiffs assert, can serve to convert those claims to claims for intentional interference with (non-contractual) business relationships.

bonds had been secured to replace the Frontier bonds before January 3, 2000. We think these allegations are mere inferences or conclusions.

The GMACCC commitment set an expiration date of January 3, 2000 "unless GMACCC agrees in writing to any extension." The complaint does not allege that GMACCC executed a writing extending the expiration date, and the plaintiffs did not attach an exhibit satisfying that requirement. Nor does the complaint contain any facts under which GMACCC could be held to have waived that requirement. *See Gold Kist Inc. v. Pillow*, 582 S.W.2d 77 (Tenn. Ct. App. 1979). Therefore, the allegation that GMACCC extended the expiration date of its commitment is simply a conclusion without any facts alleged to support it, and is not entitled to be taken as true. *See Swallows v. Western Electric Co., Inc.*, 543 S.W.2d 581 (Tenn. 1976).

The allegation on information and belief that "suitable" bonds had been found by January 3, 2000 does not satisfy the written requirement that bonds "acceptable to [GMACCC]" must be supplied. Therefore the complaint does not contain an allegation that the conditions precedent to closing had all been satisfied.

Since the GMACCC commitment expired on January 3, 2000, the other defendants cannot be held liable for inducing a breach of that commitment.

## VI.

The fraud claim is also separate from the claims based on contract. Therefore it must be dealt with separately. The allegations of fraud are contained in these paragraphs of the complaint:

46. By representations and omissions, the defendants intentionally led Strategic and FPE to believe that Strategic and FPE were to be involved in the closing, with the intent to prevent Strategic and FPE from enforcing their rights to the Facility and to the moneys earned by them under the Strategic Commitment.

\* \* \*

84. The defendants intentionally through acts or omissions misrepresented to Strategic and FPE that Strategic and FPE were still a part of the transaction to purchase the Facility by, among other things, correspondence sent to Strategic and FPE encouraging Strategic and FPE to aid in finalizing the terms of the transaction, including the procurement of a performance bond.

85. The defendants knew that these representations and statements to Strategic and FPE were false. In fact, the defendants intended to and did remove Strategic and FPE from the transaction.

86. The representations, statements, and omissions by the defendants related to material facts of the transaction, i.e., that Strategic and FPE were an integral part of the transaction and that the transaction would include them.

-8-

87.     Strategic and FPE reasonably relied upon these representations and omissions to their detriment when they did not take action to enjoin the transaction or otherwise take action to protect their rights.

The chancellor dismissed the fraud claim because of the failure to comply with the requirements of Rule 9.02, Tenn. R. Civ. P., that "the circumstances constituting fraud or mistake shall be stated with particularity." There is a companion rule set forth in Rule 8.06 that all pleadings shall be construed so as to do substantial justice. *See Ezell v. Graves*, 807 S.W.2d 700 (Tenn. Ct. App. 1990); *cf. Sullivant v. Americana Homes, Inc.*, 605 S.W.2d 246 (Tenn. Ct. App. 1980). In *City State Bank v. Dean Witter Reynolds*, 948 S.W.2d 729 (Tenn. Ct. App. 1996), the court found the complaint sufficient where it "specifically identifies the time and place of each alleged false representation, and identifies the manner in which each representation was deemed to have been fraudulent." 948 S.W.2d at 738.

We think that the complaint does fail the particularity test. An inspection of the complaint shows that the allegations are only general and that no particular defendant is identified as the one making the false and misleading statements. At a minimum the actors should be identified and the substance of each statement should be pled. We think the fraud claims were properly dismissed.

Even if we are wrong in affirming the dismissal of the fraud count, we should point out that the damages resulting from the misrepresentation would be far different from the benefit of the bargain in the Dylan/Mid-American transaction. Only those damages resulting from the misrepresentation and the reliance thereon would be recoverable.

## VII.

The complaint also contains a claim for unjust enrichment but the plaintiffs did not discuss the dismissal of that claim in their brief. Rule 27 of the Tennessee Rules of Appellate Procedure requires that a brief contain a statement of the issues along with an argument on "the issues presented." The failure to comply with this rule results in a waiver of that issue. *Blair v. Badenhope*, 940 S.W.2d 575 (Tenn. Ct. App. 1996); *Taylor v. State*, 875 S.W.2d 684 (Tenn. Crim. App. 1993).

## VIII.

The complaint also sought punitive damages. But with the dismissal of the other parts of the complaint there are no grounds on which to base a punitive damages award. *Hodges v. Toof*, 833 S.W.2d 896 (Tenn. 1992).

## IX.

The chancellor did not dismiss the plaintiff's claims for indemnity under the September 2, 1999 agreement. These claims will presumably be decided on remand.

We affirm the judgment of the court below. The cause is remanded to the Chancery Court of Davidson County for any further proceedings necessary. Tax the costs on appeal to the appellants, Strategic Capital Resources, Inc. and FPE Funding, LLC.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.