**J.M. KRUPAR CONSTRUCTION CO., INC. a/k/a JMK Construction, Appellant,**

**v.**

**Dr. Wade R. ROSENBERG and Abercrombie Builders, Inc., Appellees.**

**Dr. Wade R. Rosenberg, Appellant,**

**v.**

**J.M. Krupar Construction Co., Inc. a/k/a JMK Construction and Abercrombie Builders, Inc., Appellees.**

**Abercrombie Builders, Inc., Appellant,**

**v.**

**Dr. Wade R. Rosenberg, Appellee.**

**No. 01–00–00450–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

May 23, 2002.

**324**

William J. Boyce, Warren Szutse Huang, Fulbright & Jaworski L.L.P., Houston, for Appellant.

John C. Tollefson, Goins, Underkofler, Crawford & Langdon, L.L.P., Dallas, Carl D. Kulhanek, Jr., Hagans, Bobb, & Burdine, P.C., Houston, Stanhope B. Denegre, Goins, Underkofler, Crawford & Langdon, Dallas, for Appellee.

Panel consists of Justices COHEN, NUCHIA, and PRICE.*

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

## OPINION

SAM NUCHIA, Justice.

Plaintiff, Dr. Wade R. Rosenberg, sued defendant Abercrombie Builders, Inc. for violations of the Texas Residential Construction Liability Act[1] and the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA)[2] for damages allegedly resulting from the faulty design and construction of Rosenberg's home. Abercrombie Builders filed a separate suit against defendant J.M. Krupar Construction Co., Inc. (JMK), which built the foundation, and others who were involved in the design and landscaping of the home. Rosenberg intervened in Abercrombie Builders' lawsuit and non-suited the defendants in the first lawsuit. The trial judge realigned the parties, making Rosenberg the plaintiff and all other parties defendants. A jury found in favor of Rosenberg on his claims against Abercrombie Builders and JMK and in favor of Abercrombie Builders on its claims against JMK. The trial court rendered judgment on the verdict, except for the jury findings of mental anguish in favor of Rosenberg, which the court disregarded, and awarded an additional $1,100,000 to Abercrombie Builders against JMK.[3] The judgment also dismissed all claims against five defendants who are not parties to this appeal. JMK appeals the judgment, Rosenberg appeals the trial court's ruling on mental anguish and the calculation of prejudgment interest, and Abercrombie Builders appeals the jury's allocation of 40 percent of the responsibility for Rosenberg's damages to Abercrombie Builders' negligence. We reverse the judgment and render judgment that Rosenberg and Abercrombie Builders take-nothing by their suit against JMK.

## BACKGROUND

Abercrombie Builders was the general contractor for the construction of a home for Rosenberg. Abercrombie Builders subcontracted with JMK to build the foundation, according to specifications set forth by an engineering firm. These specifications included a two-foot deep foundation pad of select fill, an inactive soil, to stabilize the foundation. The foundation was completed in August 1990, and the home was completed in 1991.

In the fall of 1992, Rosenberg noticed a crack in an exterior wall and another on an interior wall of the house. In response to his call, the architect and builder inspected the cracks and said they were caused by normal settling. Thinking he should get another opinion, Rosenberg hired Wilson Wan, an independent engineer, in February 1993 to inspect the house. Wan provided Rosenberg with a written report detailing various cracks and separations, and Wan recommended (1) checking for leaks in the storm drain and downspout connections, (2) checking for surface runoff ponding at the corner of the house, and (3) coring through the garage slab to determine whether the select fill was properly prepared and compacted. Rosenberg followed the first two recommendations, but did not follow the third. In May 1993, an agent for Rosenberg used the Wan report to challenge the Harris County Appraisal District's tax appraisal of the house. The agent testified before the appraisal board that the house had foundation problems, and he used the Wan report and photo-

---

1. Tex. Prop.Code Ann. §§ 27.001–.007 (Vernon 2000).

2. Tex. Bus. & Com.Code Ann. §§ 17.41–.63. (Vernon 1987 & Supp.2002).

3. Neither the verdict nor the judgment explains the additional award of $1,100,000 to Abercrombie Builders.

graphs showing damage to the house to support the challenge. The board reduced the appraisal by $41,200.

At some point, Rosenberg had the cracks repaired, but, by the fall of 1993, they had returned, were larger, and appeared in other places. Alarmed, Rosenberg called Richard Peverley of Peverley Engineering Incorporated, who determined that the east side of the house was three inches higher that the west side and informed Rosenberg that the house had foundation problems. The Peverley report stated:

> Because the deflections that have occurred in this foundation are in excess of accepted design criteria, it is our opinion that **it has failed to perform the function for which intended and is in need of immediate repair.**
>
> Before any foundation repair work can be done or foundation plans and specifications created, **it is essential that soils and concrete testing be conducted by an independent laboratory for the express purpose of determining if the residential building was constructed in conformance with the plans.** The following is recommended. **A minimum of three (3) concrete cores should be extracted from the foundation** and tested in accordance with ASTM C-42.... In addition, **soil samples should be extracted through the core holes and the soil under the foundation examined for type, foreign material, and bedding sand.**
>
> ....
>
> The foundation of this residence was observed to have incurred deflections which **caused a severe amount of damage to other structural components....** First the foundation does indeed slope in a downward direction from the front wall toward the center of the foundation and toward the West wall in the master bedroom area. The foundation also has an upward slope toward the utility room and toward the garage. Second, **the degree of slope is extremely severe....** Foundation-induced damage observed included cracks on exterior brick veneer, wide separations between brick veneer and window frames, separations of upper facia board, cracks on interior sheetrock walls, separations between molding and sheetrock, door frames which had been distorted to be out-of-square, and floors that were in an obvious sloping condition....
>
> ....
>
> When deflections occur in a residential foundation that are sufficient to damage other structural components, one can conclude that the foundation has failed to perform the function for which intended.
>
> ....
>
> .... **Thus, the deflections in this foundation must be concluded to constitute the failure of a major structural element.**
>
> .... Certainly, residential buildings which have incurred such damage in the greater Houston area can not be sold at their fair-market value, or possibly not even sold at all, until the foundation has been repaired. In our opinion, **the conditions observed during this inspection are sufficiently severe** that repairs are required to establish the original state of livability and habitability that the owner had anticipated when the property was purchased.

In its conclusion, the report stated:

> Based upon the observations made during this inspection, it is our opinion that the foundation of this residential building **has failed to perform the function for which intended** and, as a result, **has caused a sufficient amount of damage**

to other structural components to adversely affect the livability/habitability of this building. On this basis, it is our recommendation that the foundation should be repaired to not only bring it into a reasonably level, but also a dynamically stable condition.

(Emphasis added.)

Believing the problem to be serious, Rosenberg sought legal counsel. Over the next two years, the house was inspected several more times, and, in the fall of 1995, core drilling revealed that the slab was not built on a pad of select fill and that, in fact, there was no pad at all.

Rosenberg filed his suit against Abercrombie Builders in December 1994. Abercrombie Builders filed its suit against JMK and other defendants in July 1996. The parties to the lawsuit styled *Rosenberg v. Abercrombie Builders* agreed, in writing, that Rosenberg could take a nonsuit in that case and intervene in the *Abercrombie Builders v. JMK* case and Abercrombie Builders would not assert limitations as a defense.

The case was tried to a jury in late September and October 1998. Rosenberg and Abercrombie Builders reached a tentative settlement early in the trial, but did not finalize it until about half-way through the trial. The parties to the agreement were Rosenberg, Abercrombie Builders, and Scottsdale Insurance Company, Abercrombie Builders' insurance carrier. In its final form, the agreement, entitled "Acknowledgment of Vicarious Liability and Confession of Judgment with Covenant to Restrict Execution to Designated Assets," included the following terms:

1. Rosenberg and Abercrombie Builders would file a joint motion for interlocutory judgment in which they would stipulate that Abercrombie Builders was vicariously liable for its subcontractors' breach of contract and that Rosenberg would recover actual damages only from Abercrombie Builders.

2. Rosenberg and Abercrombie Builders would pursue their claims against JMK, and Abercrombie Builders would not settle any claims without the approval of Scottsdale.

3. Rosenberg would be entitled to a judgment against Abercrombie Builders of not more than $1,100,000 and not less than $755,000, to be based on the jury's verdict, and Abercrombie Builders would be entitled to credits of $700,000 paid by Scottsdale and $55,000 in settlements from the other defendants except JMK. Rosenberg would not execute on the judgment entered against Abercrombie Builders, except that the first $345,000 of any proceeds of a judgment for Abercrombie Builders against or settlement by JMK would be paid to Rosenberg.

4. Scottsdale would dismiss its action for declaratory judgment filed against Abercrombie Builders in federal court.

5. Scottsdale would pay $700,000 to Rosenberg without admitting coverage.

6. Rosenberg indemnified Abercrombie Builders and Scottsdale as to any claims asserted by Rosenberg.

7. Rosenberg and Abercrombie Builders released Scottsdale from any further claims in connection with the lawsuit.

8. Rosenberg's release applied only to Scottsdale, the funds paid by Scottsdale were not for punitive damages, and Rosenberg did not release his claims against Abercrombie Builders.

As part of the consideration for the agreement, the parties agreed to keep the terms of the agreement confidential. The agreement, in multiple counterparts, was signed on or about October 9, 1998. A letter from Rosenberg's attorney to the attorneys for Abercrombie Builders and Scottsdale, faxed on October 12, 1998, amended the agreement, at the suggestion of the trial judge, to eliminate a requirement that Rosenberg approve any settlement with JMK from an earlier version of paragraph two and to add, in paragraph three, the "high-low" portion of the agreement.

The jury found that the negligence of Abercrombie Builders and JMK and their failure to comply with their warranties proximately caused Rosenberg's damages and apportioned 40 percent of the liability to Abercrombie Builders and 60 percent to JMK. The jury found that Rosenberg should have discovered the wrongful acts of JMK by November 1995. The jury assessed damages for negligence and breach of warranty at $165,000 for reduction in market value of the home after all repair work is completed, $314,673 in past repairs, $30,000 in future repairs, $300,000 in past mental anguish, and $30,000 in future mental anguish.

The jury further found that JMK engaged in a false, misleading, or deceptive act or practice, engaged in an unconscionable act or course of action, and failed to comply with a warranty; that these acts were a producing cause of Rosenberg's damages; and that Rosenberg should have discovered these acts by November 1995. The jury assessed the same damages for reduction in market value and past and future repair as for negligence. The jury found that these acts were committed knowingly and assessed $150,000 in past mental anguish damages, no future mental anguish damages, and $250,000 in addition-

al damages. The jury also assessed $350,000 in attorney's fees and $60,000 in contingent appellate attorney's fees. In addition, the jury found that JMK fraudulently concealed its wrongful or negligent acts and that Rosenberg, in the exercise of reasonable diligence, should have discovered those acts by November 1995.

In the issues submitted on behalf of Abercrombie Builders, the jury found that Abercrombie Builders and JMK entered into a written agreement, that JMK failed to comply with the agreement, and that Abercrombie Builders should have discovered the failure to comply and the damages caused to Abercrombie Builders by November 1995. The jury awarded damages of $32,936.50 for the difference in the value between the foundation JMK agreed to build and the foundation JMK actually built. The jury also awarded $100,000 in attorney's fees incurred through February 25, 1997, $150,000 in attorney's fees incurred from February 26, 1997 through the trial, and $25,000 in contingent appellate attorney's fees. The jury found that, when JMK entered into the written agreement with Abercrombie Builders, JMK was aware of the requirement that it indemnify and hold harmless Abercrombie Builders for damages sustained by Abercrombie Builders related to construction of the foundation for the home.

The trial court disregarded the jury's award of mental anguish damages. The court awarded damages to Rosenberg jointly and severally against JMK and Abercrombie Builders and applied the $755,000 dollar-for-dollar settlement credit for a net award of actual damages and attorney's fees of $164,673 plus prejudgment interest. The trial court awarded Rosenberg $250,000 as additional damages under the Deceptive Trade Practices Act against JMK. The trial court awarded Abercrombie Builders $1,132,936.50 as ac-

tual damages against JMK, plus $275,000 as attorney's fees.

## DISCUSSION

### I. JMK'S APPEAL

#### A. Rosenberg's Negligence and DTPA Claims

■ In issue 2a,[4] JMK contends all Rosenberg's claims against JMK are barred by the applicable statutes of limitations: two years for negligence and violation of the DTPA and four years for common-law breach of an implied warranty. JMK argues that, even if the discovery rule or the doctrine of fraudulent concealment applies to Rosenberg's claims, the evidence is legally and factually insufficient to support the jury's finding that Rosenberg should, in the exercise of reasonable diligence, have discovered the wrongful acts of JMK in 1995. JMK contends that the evidence conclusively established that the limitations period was tolled only until fall 1992 or fall 1993.

■ The discovery rule is a limited exception to the statute of limitations. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex.1996). The discovery rule is applied when the nature of the injury is inherently undiscoverable. *Id.* at 456. Thus, the discovery rule should be applied only when "it is difficult for the injured party to learn of the negligent act or omission." *Id.* (quoting *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988)). The DTPA incorporates the discovery rule into the statute, providing that the claim accrues when "the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or

practice." TEX. BUS. & COM.CODE ANN. § 17.565 (Vernon 1987). Under both the DTPA and common-law causes of action, accrual occurs when the plaintiff knew or should have known of the wrongful injury. *KPMG Peat Marwick v. Harrison County Fin. Corp.,* 988 S.W.2d 746, 749–50 (Tex. 1999) (rejecting the argument that a DTPA claim does not accrue until the plaintiff knows not only of the injury, but the specific nature of the wrongful act that caused the injury). A plaintiff need not know the full extent of the injury before limitations begin to run. *Murphy v. Campbell,* 964 S.W.2d 265, 273 (Tex.1997).

■ We consider only JMK's no-evidence contention. In reviewing a no-evidence issue, we consider only the evidence and inferences that tend to support the finding, disregarding all evidence and inferences to the contrary. *Vannerson v. Vannerson,* 857 S.W.2d 659, 666 (Tex.App.-Houston [1st Dist.] 1993, writ denied). If there is any evidence of probative force to support the finding, we will overrule the issue. *Id.* When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of the fact's existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 755 (Tex.1970).

■ It was Rosenberg's burden to plead and prove facts supporting the discovery rule. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988). Generally, in construction-defect cases, limitations begin to run when an owner becomes aware of property damage. *See Ben Fitzgerald Realty Co. v. Muller,* 846 S.W.2d

---

4. JMK's issues as presented in its brief are in outline format rather than the customary numbered format. We have designated

JMK's issues as they are designated in JMK's outline of the "Issues Presented."

110, 118–19 (Tex.App.-Tyler 1993, writ denied) (limitations began when damages began to show on the house); *Hanmore Dev. Corp. v. JBK Enters.*, 776 S.W.2d 738, 740 (Tex.App.-Corpus Christi 1989, writ denied) (limitations began when owner first discovered roof leak); *Tenowich v. Sterling Plumbing Co.*, 712 S.W.2d 188, 189–90 (Tex.App.-Houston [14th Dist.] 1986, no writ) (limitations began when owner discovered leaks in pipe).

In this case, there were five discovery questions relating to Rosenberg's claims under (1) negligence, (2) failure to comply with any warranty, (3) false, misleading, or deceptive acts under the DTPA, (4) unconscionable actions under the DTPA, and (5) failure to comply with any warranty under the DTPA. These questions were the same, except as they related to the separate claims. They asked, "By what date should DR. WADE R. ROSENBERG, in the exercise of reasonable diligence, have discovered [the actions of J.M. Krupar Construction giving rise to the particular claim]?" Thus, the issue in this case, consistent with the jury questions and the case law, is not when *did* Rosenberg discover JMK's wrongful actions, but when *should, in the exercise of reasonable diligence,* Rosenberg have discovered JMK's wrongful actions. Evidence of when he *did* discover is not necessarily evidence of when he *should have* discovered.

Rosenberg contends that all his claims against JMK were timely filed because he did not discover the *actions* of JMK giving rise to those claims until November 1995, as found by the jury in five separate discovery questions. Rosenberg argues that, under the DTPA, the discovery rule tolled the accrual of his cause of action until he discovered the *cause* of the foundation failure—the absence of select fill—through the core drilling. This contention is similar to that rejected by the supreme court

in *KPMG Peat Marwick*, 988 S.W.2d at 749.

In support of the jury's answers to the discovery questions, Rosenberg points to evidence that JMK's contract was with Abercrombie Builders, not Rosenberg, and that misrepresentations were made to Abercrombie Builders, who received JMK's invoice and wrote the check paying JMK for the construction of the slab. Rosenberg argues that he first discovered that there was no select fill beneath his foundation, and that the absence of the select fill was the cause of his foundation problems, when he received an engineer's report in November 1995 showing the result of core drillings in his slab. Although this is evidence that Rosenberg *did* discover JMK's wrongful acts in November 1995, it is not evidence that Rosenberg *should not have* discovered JMK's wrongful acts until that date.

Rosenberg first noticed cracks in his walls in the fall of 1992. Although Abercrombie Builders and the architect reassured him it was due to normal settling, Rosenberg was not satisfied and hired two engineers to inspect the house, Wan in February 1993 and Peverley in the fall of 1993. Both engineers provided Rosenberg with written reports showing that the house had foundation problems and itemizing other structural damage caused by the faulty foundation. Both reports recommended that core drillings be made to determine whether the foundation had been properly prepared and constructed. Rosenberg used the Wan report in his challenge to the tax appraisal of the house's value by showing that the house had foundation problems. The Peverley report concluded that the foundation had failed to perform the function for which it was intended. Rosenberg followed two of Wan's recommendations, but did not have the recommended core samples taken. He

was concerned enough to seek legal counsel after receiving the Peverley report, but, again, did not follow the recommendation regarding core samples.

This evidence conclusively established that Rosenberg, in the exercise of reasonable diligence, should have discovered the acts or omissions of JMK as they related to the construction of Rosenberg's house foundation, whether presented in terms of negligence, breach of warranty, or violations of the DTPA, at least by the fall of 1993. *See id.* There is no evidence to support the jury finding that Rosenberg should not have discovered such acts until November 1995.

The jury also found, in question number 20, that JMK fraudulently concealed its wrongful or negligent acts or omissions and further found, in question number 21, that Rosenberg should have discovered the wrongful acts so concealed by November 1995. Rosenberg contends that JMK's presentation of an invoice to Abercrombie Builders for construction of a pad was the act of concealment.

We need not decide whether a misrepresentation by JMK to Abercrombie Builders is fraudulent concealment as to Rosenberg, or whether Abercrombie Builders was entitled to rely on the invoice as evidence that a pad had been built. Even if reliance on the invoice was reasonable, the limitations under fraudulent concealment began when Rosenberg, in the exercise of reasonable diligence, should have discovered the wrongful acts and omissions of JMK—no later than the fall of 1993. *See id.* at 750.

Rosenberg's negligence and DTPA claims are subject to a two-year statute of limitations, which was tolled until fall 1993. Rosenberg did not file his claims against JMK until August 19, 1996, almost three years after limitations began to run. Therefore, the negligence and DTPA claims are barred by limitations. Accordingly, we sustain JMK's issue 2a with respect to Rosenberg's negligence and DTPA causes of action.

Because we determine that Rosenberg's DTPA claims are barred, we need not reach JMK's issue 2d regarding the jury's finding that JMK knowingly violated the DTPA or his issue 2e regarding attorney's fees.

## B. Rosenberg's Claim for Breach of Implied Warranty

In issue 2b, JMK contends that Rosenberg's warranty claim fails as a matter of law because a homeowner may not assert a claim for breach of good and workmanlike performance against a subcontractor, citing *Codner v. Arellano,* 40 S.W.3d 666, 674 (Tex.App.-Austin 2001, no pet. h.).

In *Codner,* a home-construction case, the general contractor hired a subcontractor to build a foundation for the home. The foundation shifted and caused damage to the home, and the home owner sued the contractor and subcontractor for negligence and violations of the DTPA. The homeowner settled with the contractor. The trial court refused to submit issues under the DTPA against the subcontractor, and only the question of negligence was submitted to the jury. The jury found that the subcontractor was not negligent, and the homeowner appealed, asserting that the DTPA issues should have been submitted to the jury. The court of appeals reasoned:

[T]o be actionable under the DTPA's prohibition on breaching implied or express warranties, a warranty must be recognized by common law or created statutorily. An implied warranty will not be imposed unless there is a demonstrated, compelling need for it. It is not necessary to impose an implied warran-

ty as a matter of public policy if the plaintiff has other adequate remedies to redress the alleged wrongs committed by the defendant.

*Id.* at 672 (citations omitted). The court went on to say:

> There is little case law regarding implied warranties. It is well settled that a builder of a residential house impliedly warrants that the house will be constructed in a good-and-workmanlike manner. Further, an implied warranty to perform services to repair or modify existing tangible property in a good-and-workmanlike manner may arise under the common law if mandated by public policy. Although we are here confronted with a service transaction, we find no case that implies a warranty of good-and-workmanlike performance from a builder's subcontractor directly to the homeowner.

*Id.* at 672–73 (citations omitted). The court noted that, in another context, it had observed that a homeowner had a contractual right to a finished building and the contract between the contractor and subcontractor did not add to the homeowner's right; if the subcontractor does not perform as it should, the contractor must make up the difference. *Id.* at 674 n. 5 (citing *Thomson v. Espey Huston & Assoc.*, 899 S.W.2d 415, 419 (Tex.App.-Austin 1995, no writ)). The court declined "to apply, as a matter of public policy, an implied warranty to a dispute between a homeowner and a subcontractor" and held that the trial court did not err in refusing to submit a jury issue on breach of a warranty of good-and-workmanlike performance.

Rosenberg argues that *Codner* is not dispositive or even persuasive because *Codner* deals only with *implied* warranties and does not discuss *express* warranties. Rosenberg notes that jury question numbers 4 and 12 ask whether JMK failed to comply with "any" warranty.[5] However, Rosenberg pleaded only breach of common law implied warranties with respect to JMK.

We conclude that *Codner* is controlling. Rosenberg's remedy is against Abercrombie Builders, which then may look to JMK for contribution or indemnity, as applicable to this case. We hold that, under the facts of this case, Rosenberg does not have a cause of action for common law breach of implied warranty against JMK. Accordingly, we sustain JMK's issue 2b.

■ Because we have determined that Rosenberg's negligence and DTPA claims are barred by limitations and that Rosenberg did not have a cause of action for breach of implied warranty against JMK, we need not reach JMK's issue 2c regarding damages and issues 1 and 3a regarding the nature of the settlement agreement.[6]

---

5. Rosenberg would have us find that an express warranty exists by combining a statement in the architect's building specifications—"The Contractor will perform all of the Work in a good and workmanlike manner in conformity with generally accepted trade practices"—with a provision in JMK's contract with Abercrombie Builders—"The Subcontractor agrees to furnish all labor, material, equipment, services, and supplies required for a complete job of: Concrete Foundation, according to the plans and specifications dated 2/1/90 revised 5/21/90, 6/6/90 as prepared by Elby S. Martin & Assoc." Clearly, Rosen-

berg has not identified an express warranty upon which he may assert a claim. The statement in the building specifications refers to the contractor. The Subcontract Agreement is between JMK and Abercrombie. That agreement does not contain any express warranties to third parties.

6. JMK's first issue challenges the agreement between Rosenberg and Abercrombie Builders as a Mary Carter agreement, which our supreme court has declared to be "void as violative of sound public policy." *Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex.1992). In

## C. Abercrombie Builders' Consequential Damages Claim

 In issue 3d, JMK contends Abercrombie Builders' claim for consequential damages resulting from the breach of contract is barred by limitations. JMK argues that the foundation was completed in summer 1990, the work was performed in full view of Abercrombie Builders' on-site superintendent, and, therefore, neither the discovery rule nor fraudulent concealment applies.

In this case, Abercrombie Builders' construction superintendent was on site every day during the time JMK was performing its contract. The superintendent's daily construction reports reveal that JMK first appeared on the site and discussed the slab with the superintendent on July 23, 1990. According to these reports, JMK began its "excavation of lot and build up of pad" on July 25, and JMK "completed pad and set finish floor elevation" on July 26. The reports record the continuing work performed by JMK each week-day until August 15, the date on which JMK poured the slab. On August 22, 23, and 24, JMK returned to the site for clean-up and grading the yard. The reports show that on some days, one or two other subcontractors were also on the site, but on many days, JMK was the only subcontractor working. Under these conditions, JMK's failure to comply with its contract was not inherently undiscoverable. Abercrombie Builders' superintendent was observing the work as it progressed. There is no evidence that JMK's breach of its contract with Abercrombie Builders was inherently undiscoverable. Therefore, the discovery rule does not apply to Abercrombie Builders' breach-of-contract claim against JMK. *See Computer Assocs.*, 918 S.W.2d at 455.

Abercrombie Builders' cause of action for breach of contract accrued on August 24, 1990, the date on which JMK completed its work in connection with the contract. Abercrombie Builders did not file its lawsuit against JMK until July 1996. Therefore, Abercrombie Builders' claim was barred by the four-year statute of limitations. Accordingly, we sustain JMK's issue 3d regarding consequential damages.

## D. Abercrombie Builders' Indemnity Claim

 In issue 3b, JMK contends that Abercrombie Builders is not entitled to indemnity because the jury found Abercrombie Builders negligent and the indemnity clause of the contract between Abercrombie Builders and JMK does not meet the express negligence test. A party who attempts to indemnify itself from its own negligence must satisfy two fair-notice requirements: (1) the express negligence

---

the usual Mary Carter agreement, the settling defendant has a stake in the plaintiff's recovery, often a rebate of some or all of the amount paid by the settling defendant to the plaintiff by giving the settling defendant a percentage of the plaintiff's recovery in excess of an agreed amount, thereby providing an incentive for the settling defendant to assist the plaintiff in maximizing its recovery against the non-settling defendants. It is this collusive arrangement between two nominally adverse parties that the supreme court condemned as a "sham of adversity." *Id.* at 249.

Like the typical Mary Carter agreement, the Rosenberg–Abercrombie Builders' agreement is a collusive agreement creating a "sham of adversity" between Rosenberg and Abercrombie Builders. The agreement settles the dispute between the plaintiff and one defendant, while keeping that settling defendant in the lawsuit. Unlike the typical Mary Carter agreement, it gives the *plaintiff* a stake in the recovery of the *settling defendant-cross plaintiff* against the non-settling defendant, thereby making it in the interest of the plaintiff and the settling defendant to maximize the *settling defendant's* recovery. Such an agreement is as violative of public policy as a typical Mary Carter agreement.

test and (2) a conspicuousness requirement. *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508 (Tex.1993).

The express negligence test was adopted by the Texas Supreme Court in *Ethyl Corp. v. Daniel Construction Co.,* 725 S.W.2d 705, 708 (Tex.1987). The court stated, "The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms." *Id.*

The contract at issue in *Ethyl* provided:

Contractor shall indemnify and hold Owner harmless against any loss or damage to persons or property as a result of operations growing out of the performance of this contract and caused by the negligence or carelessness of Contractor, Contractor's employees, Subcontractors, and agents or licensees.

*Id.* at 707. The court determined that this indemnity clause did not meet the express negligence test, finding that the phrases "any loss" and "as a result of operations" did not show an intent on Ethyl's part to cover its own negligence. *Id.*

In *Glendale Construction Services, Inc. v. Accurate Air Systems, Inc.,* this Court held that the following indemnification clause did not meet the express negligence test:

[T]he Subcontractor shall indemnify and hold harmless ... the Contractor ... from and against all claims ... arising out of or resulting from the performance of the Subcontractor's work under this Subcontract provided that any such claim ... to the extent caused in whole or in part by a negligent act or omission of the Subcontractor ... regardless of whether it is caused in part by a party indemnified hereunder.

902 S.W.2d 536, 538–39 (Tex.App.-Houston [1st Dist.] 1995, writ denied).

■ The express negligence test is not an affirmative defense; it is a rule of contract interpretation. *Fisk Elec. Co. v. Constructors & Assoc.,* 888 S.W.2d 813, 814 (Tex.1994). The intent of the parties must be stated within the four corners of the contact. *Ethyl,* 725 S.W.2d at 708.

The contract between Abercrombie Builders and JMK contains the following provision in paragraph 10 under General Conditions on the reverse side of the document:

Contractor shall in no way be liable for any damage or injury caused to the person or property of Subcontractor's employees or any third party. Subcontractor specifically agrees to indemnify, save harmless and fully reimburse Contractor, its agents, officers and employees, from all suits, actions or claims of any character, type or description, brought or made for or on account of any injuries or damages received or sustained by any person or persons or property, arising out of or occasioned by, the acts of Subcontractor or Subcontractor's agents, officers or employees, in the execution and/or performance of this Contract. Subcontractor shall additionally reimburse Contractor for any and all expenditures or expenses associated with the defense of lawsuits arising out of any of the above described circumstances; provided, however, that Contractor shall have the option to compel Subcontractor to defend any and all causes of action brought against Contractor, based in whole or in part upon allegations of negligence on the part of Subcontractor or Subcontractor's employees, and Subcontractor shall pay any judgment rendered against Contractor from any such case and shall reimburse and fully indemnify Contractor for any expenditures or expenses made or incurred by Contractor for any reason of any such suit or suits notwithstanding Contractor's option to compel Subcontractor to defend said suits.

Abercrombie Builders argues that the agreement clearly states that "JMK shall reimburse and fully indemnify [Abercrombie Builders] for any expenditure or expenses" incurred by such a suit "notwithstanding [Abercrombie Builders'] option to compel [JMK] to defend such suits." Abercrombie Builders interprets "notwithstanding" to mean "whether or not" and concludes that that reading shows an agreement to indemnify Abercrombie Builders "whether or not" Abercrombie Builders could compel JMK to defend it, thus exculpating Abercrombie Builders from its own negligence.

We do not agree with such a tortured interpretation. "Notwithstanding" does not mean "whether or not;" it means "in spite of." WEBSTER's II NEW COLLEGE DICTIONARY 79 (1995). Therefore, the sentence emphasized by Abercrombie Builders means that, if a claim is brought against Abercrombie Builders for injuries caused by the acts of JMK, *in spite of* the fact that Abercrombie Builders may compel JMK to defend the suit, JMK shall reimburse Abercrombie Builders for any expenses incurred by Abercrombie Builders resulting from the claim. Nowhere in the indemnity clause does it expressly state that JMK will indemnify Abercrombie Builders for expenses incurred in a claim resulting from Abercrombie Builders' own negligence. Thus, the clause does not meet the express negligence test.

In light of our determination that the express negligence test was not met, we need not consider the conspicuousness requirement, nor need we reach issue 3c regarding whether the agreement was reasonable or issue 3f regarding the damages award on the indemnity claim.

We sustain JMK's issue 3b challenging the indemnity award.

Because we have determined that Abercrombie Builders' claim based on breach of contract is time barred and it has no claim under the indemnity clause of its contract, there is no basis for an award of attorney's fees. Accordingly, we need not consider JMK's issue 3e regarding the award of attorney's fees to Abercrombie Builders.

## II. ROSENBERG'S APPEAL

In seven issues, Rosenberg appeals the trial court's granting of JMK's motion for judgment notwithstanding the verdict with respect to the jury findings on mental anguish. Rosenberg also complains that the trial court used the wrong date in its calculation of prejudgment interest.

We need not reach Rosenberg's appeal as it applies to JMK because of our determination that Rosenberg's causes of action against JMK for negligence and violation of the DTPA are barred by limitations and that Rosenberg does not have a cause of action against JMK for breach of an implied warranty.

Rosenberg's appeal names Abercrombie Builders as an appellee. However, Rosenberg does not present any issues regarding Abercrombie Builders. Therefore, we have nothing to review.

## III. ABERCROMBIE BUILDERS' APPEAL

Abercrombie Builders complains that the jury's allocation of 40 percent of causation of Rosenberg's injury to the negligence of Abercrombie Builders is against the overwhelming weight of the evidence and is clearly wrong and unjust. Abercrombie Builders argues that Rosenberg's damages were caused solely by JMK's failure to perform the work. Thus, Abercrombie Builders contends the evidence is factually insufficient to support the jury finding that the negligence of Abercrombie Builders and JMK was the proximate cause of Rosenberg's damages and the finding allocating 40 percent of the causation to Abercrombie Builders and 60 percent to JMK.

A complaint of factual insufficiency of the evidence to support a jury finding must be preserved in a motion for new trial. Tex.R. Civ. P. 324(b)(2); Tex.R.App. P. 33.1(a). Abercrombie Builders did not file a motion for new trial. Therefore Abercrombie Builders has not preserved its complaint for appeal.

## CONCLUSION

We have determined that Rosenberg's causes of action for negligence and violations of the DTPA are barred by limitations, Rosenberg does not have a cause of action for common-law breach of implied warranty against JMK, Abercrombie Builders' claim for consequential damages is barred by limitations, and Abercrombie Builders does not have a contractual right to indemnity for its own negligence. We therefore reverse the judgment of the trial court and render judgment that Rosenberg take nothing by his suit against JMK and Abercrombie Builders take nothing by its suit against JMK.