# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### JANUARY 19, 2006 Session

## J. O. HOUSE v. J. K. EDMONDSON

**Direct Appeal from the Chancery Court for Shelby County**
**No. 99-0326-02     Arnold B. Goldin, Chancellor**

---

**No. W2005-00092-COA-R3-CV - Filed May 16, 2006**

---

In 1997, the Appellant, a shareholder in a Tennessee corporation, reviewed the corporation's records and discovered that the corporation's majority shareholder, who also served as the corporation's president and chairman of the board of directors, had been misappropriating corporate funds for his personal use. In 1999, the Appellant filed a shareholder's derivative action against the majority shareholder of the corporation alleging breach of fiduciary duty. In addition to his derivative claim, the Appellant also filed a direct claim against the majority shareholder for breach of a Pre-Incorporation Agreement signed by the shareholders at the corporation's inception. The corporation appointed a one person special litigation committee to investigate the Appellant's derivative action. The committee determined that the majority shareholder had indeed misappropriated corporate funds. In its report to the board of directors, the committee recommended that the corporation either attempt to settle the lawsuit with the majority shareholder pursuant to terms suggested by the committee or, in the event the majority shareholder declined such terms, proceed with the litigation. The trial court subsequently approved the report, and the corporation settled the derivative litigation. Regarding the direct claim for breach of the Pre-Incorporation Agreement, the majority shareholder moved for summary judgment, and the trial court granted the motion. The Appellant filed an appeal to this Court. We affirm the trial court's decision to approve the special litigation committee's report. We reverse the trial court's decision to grant summary judgment to the majority shareholder on the Appellant's direct claim, as a genuine issue of material fact exists as to whether the Appellant's claim is barred by the applicable statute of limitations.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined and HOLLY M. KIRBY, J., partially dissented.

Tim Edwards, Memphis, TN; Kent J. Rubens, West Memphis, AR, for Appellant

Jef Feibelman, Memphis, TN, for Appellee

John McQuiston, II, Memphis, TN, for Intervenor, Ram-Tenn, Inc.

# OPINION

## I.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1968, J.O. House (hereinafter "House" or "Appellant") and J.K. Edmondson (hereinafter "Edmondson"), along with other individuals, formed Ram-Tenn, Inc. (hereinafter "Ram-Tenn" or, collectively with Edmondson, the "Appellees"), a Tennessee corporation, for the purpose of constructing, purchasing, leasing, and managing hotels, restaurants, and other places of public accommodation. House, Edmondson, and the other shareholders signed a Pre-Incorporation Agreement providing that, in the event a shareholder wished to sell his shares of stock, he

> shall first offer the stock to the corporation and, then, to the other
> purchasers, owners or holders of outstanding stock in the corporation
> at the price offered by any other bona fide purchaser before any such
> stockholder shall sell or offer to sell to any other person or persons
> who may otherwise qualify to own and hold the classified stock to be
> issued under the Articles of Incorporation.

At Ram-Tenn's inception, Edmondson received eighty (80) shares of the corporate stock, or 25 % of the outstanding shares, and House received sixteen (16) shares of the corporate stock, or 5% of the outstanding shares. Edmondson also became the president of Ram-Tenn and chairman of its board of directors. Between 1968 and 1988, Edmondson acquired additional shares of Ram-Tenn stock and gained control of 62% of the corporate stock.

In 1997, House requested to see the financial records of Ram-Tenn. Upon examining the records, House discovered that Edmondson had been misappropriating corporate funds for his personal use. For instance, House discovered that Edmondson used another corporation he and his family had a controlling interest in to bill Ram-Tenn for products and supplies at substantially increased prices, used Ram-Tenn funds to pay insurance premiums for another corporation, paid the tuition bill for a female attending the University of Mississippi, made contributions to a church, used funds to pay various personal expenses, and bought a bush hog too large to be used for corporate properties.

On April 12, 1999, House filed a shareholder's derivative action in the Chancery Court of Shelby County naming Edmondson as the defendant. House sought to recover damages from Edmondson on behalf of the corporation, and he noted that he did not make a demand on the corporation because such action would prove futile. House also asserted a claim against Edmondson directly for breach of the Pre-Incorporation Agreement.[1] The chancellor subsequently granted Ram-Tenn's motion to intervene in the lawsuit.

---

[1] House also filed a separate lawsuit in the Circuit Court of Shelby County which the chancellor consolidated with the action pending in the chancery court.

On December 14, 1999, the Ram-Tenn board of directors passed a resolution providing as follows:

> RESOLVED, that Michael McLaren, Esq. [(hereinafter "McLaren")] of Memphis, Tennessee be and is hereby appointed a special litigation committee to exercise fully the powers of the Board of Directors of the Company to investigate the charges made in the shareholder's derivative action brought by J.O. House against J.K. Edmondson, to make such inquiries as he deems reasonable, and to use his independent business judgment to determine whether, in the best interest of the corporation, the litigation should be continued, dismissed, or settled.

After receiving the appointment, McLaren retained an accounting firm to assist him with his investigation. In evaluating the allegations lodged by House, McLaren, relying on the applicable statute of limitations, limited his inquiry to the four years preceding the date on which House filed his complaint.

After conducting his investigation, McLaren issued a report concluding that Edmondson had indeed misappropriated funds from Ram-Tenn for his personal use. In a supplemental report, McLaren made the following recommendation to the Ram-Tenn board of directors:

> I recommend that Ram-Tenn, Inc. either pursue its lawsuit against Mr. J.K. Edmondson or accept a settlement of that lawsuit on the following terms and conditions:
>
> 1. Mr. J.K. Edmondson shall pay to the Corporation the sum of $552,501.61. . . . This figure as arrived at after extensive review of the accounting procedures utilized by Ram-Tenn, Inc., and the manner, amount and method of payments made by Ram-Tenn, Inc. to the various and sundry vendors it employed. Given the pattern of haphazard bookkeeping practices, if payments were not supported by adequate accounting information, reimbursement is being sought. . . .
> 2. As part of the settlement with Mr. Edmondson, a complete release would be given to him by the Corporation and he, likewise, would release the corporation. He also would secure releases of Ram-Tenn, Inc. from any other Corporations in which he may have an interest . . . .
> 3. The money received from Mr. Edmondson would be distributed pursuant to corporate principals and stock ownership issues. The settlement agreement would

confirm that Mr. Edmondson does, indeed, have a 62% ownership in the Corporation, and he would receive a distribution pursuant to that ownership interest.

4.    In the event that any shareholders (including Mr. Edmondson) waive payment to the Corporation, their allocated distributive amount shall be retained by Mr. Edmondson.

5.    In the event Mr. Edmondson does not settle the case pursuant to the Corporation's demand, it is recommended that the Corporation pursue the lawsuit, seeking sums which may have been misallocated by Mr. Edmondson prior to 1994, seeking punitive damages, and seeking an interest rate of 10% for prejudgment items.

. . . .

7.    The recommended demand takes into account the likelihood of success on the merits of the case as it is presently pled, the extraordinary expense of going forward with the case, the delay in wrapping up the affairs of the non-functioning corporation, the age of the defendant, Mr. Edmondson, the length of time involved to try the case, and the almost certain appellate process following any trial.

Following a motion by Ram-Tenn to approve the report, Chancellor Floyd Peete conducted a hearing on the motion. Unfortunately, Chancellor Peete died before he could issue a ruling on the motion, and Chancellor Arnold Goldin took over the case.

Edmondson and Ram-Tenn subsequently filed a renewed motion to approve McLaren's report. On January 16, 2004, after reviewing the transcripts of the hearings before Chancellor Peete and entertaining new testimony, Chancellor Goldin entered an order stating as follows:

1)    The supplemental report of the Special Litigation Committee is approved.
2)    The Committee's findings and recommendations were made in good faith, are supported by the record of the investigation conducted by it, are consistent with the corporation's best interest as articulated in its Report and Supplemental Report and is otherwise in conformity with the legal standards set out in Lewis v. Boyd, 838 S.W.2d 215 (Tenn. App. 1992).

-4-

3) The Special Litigation Committee shall attempt to negotiate a settlement with Defendant J.K. Edmondson in accordance with the findings and recommendations set out in the supplemental report.

4) Upon the settlement of RAM-TENN'S claims against Defendant Edmondson, an Order of Dismissal with prejudice shall be entered by the Court dismissing the shareholder's derivative claims.

5) Pursuant to T.C.A. Section 48-17-401, attorney's fees are not available to a successful Plaintiff in a shareholder's derivative proceeding involving a "for profit" corporation.

Pursuant to the order, McLaren negotiated a settlement with Edmondson on behalf of Ram-Tenn. Thereafter, Edmondson filed a motion for summary judgment regarding House's direct claim against him for breach of the Pre-Incorporation Agreement. House responded by filing his own motion for summary judgment on this claim.

On December 22, 2004, Chancellor Goldin entered an order finding as follows:

1. The court having found that there is no genuine issue of any material fact and that a judgment as a matter of law should be entered in favor of the defendant J.K. Edmondson, the motion for summary judgment of the defendant J.K. Edmondson is hereby granted and the court holds that the defendant J.K. Edmondson is properly the owner of 62% of the outstanding shares of stock of the defendant Ram-Tenn, Inc.

2. The motion for partial summary judgment of the plaintiff J.O. House is denied.

3. The court's Order of January 16, 2004 Approving the Supplemental Report of the Special Litigation Committee is affirmed and reiterated. The Report recommended that J.K. Edmondson pay the corporation $552,501.01 (as of June 1, 2004) in full settlement less any funds waived by shareholders. At this time 90% of such funds have been waived . . . .

4. J.K. Edmondson shall escrow with the Special Litigation Committee the sum of $56,326.20 (the principal of $55,250.16 as of June 1, 2004, plus interest accruing at $5.88 per day until December 1, 2004) and the Special Litigation Committee shall prepare and likewise place in escrow a full release of any and all claims as contemplated in the Supplemental Report of the Special Litigation Committee. The sum put in escrow by the defendant J.K. Edmondson shall be attributable solely to those shareholders who have not executed waivers as provided for in the Supplemental Report of the Special Litigation Committee.

House timely filed an appeal to this Court presenting, as we perceive them, the following issues for our review:

1. Whether the trial court erred in approving the report of the special litigation committee;
2. Whether the trial court erred in denying House's request for attorney's fees; and
3. Whether the trial court erred in granting summary judgment to Edmondson on House's claim for breach of the Pre-Incorporation Agreement.

For the reasons set forth more fully herein, we affirm in part and reverse in part the decision of the chancery court, and we remand this case to the trial court for further proceedings.

## II.
### ANALYSIS

### A.
### *The Special Litigation Committee's Report*

Once commenced, a shareholders' derivative action cannot be dismissed or settled without the approval of the trial court. TENN. CODE ANN. § 48-17-401(c) (2002). Tennessee's version of the Model Business Corporation Act does not contain a statute authorizing the use of special litigation committees. *See* TENN. CODE ANN. § 48-11-101 *et seq.* (2002). In *Lewis ex rel. Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215 (Tenn. Ct. App. 1992), this Court became the first in Tennessee to consider the propriety of a corporation's use of a special litigation committee to evaluate a shareholder's derivative action. In joining those jurisdictions permitting their use as an appropriate way to recognize the interests of the corporation in derivative litigation, we held that, when a special litigation committee is utilized, the party seeking to dismiss a derivative suit based upon the recommendation of a special litigation committee has the burden of proving the following to the trial court: (1) the special litigation committee's independence; (2) good faith on the part of the special litigation committee; (3) the special litigation committee's procedural fairness; and (4) the soundness of the special litigation committee's conclusions and recommendations. *Lewis*, 838 S.W.2d at 225 (citing *Houle v. Low*, 556 N.E.2d 51, 58 (Mass. 1990)).

On appeal, House argues that the trial court erred in accepting McLaren's recommendation under the framework established by our decision in *Lewis v. Boyd*. When evaluating the trial court's decision to approve the recommendation of the special litigation committee in this case, we employ the following standard of review:

> When a trial court sits without a jury in a civil action, this Court reviews its findings of fact *de novo* upon the record of the court, affording such findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). However, for questions of law, the scope of review is *de novo* with no presumption of correctness afforded to the trial court's conclusions

-6-

of law. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

*Brady v. Calcote*, No. M2003-01690-COA-R3-CV, 2005 Tenn. App. LEXIS 8, at *7 (Tenn. Ct. App. Jan. 11, 2005) (no perm. app. filed). House does not conform his arguments on appeal to the specific factors enunciated in *Lewis*, however, we will address, in turn, each factor and any arguments made by House which are relevant to a particular factor.

House does not take issue with McLaren's independence in this case. In evaluating the independence of a special litigation committee, the trial court must consider the following: "(1) the size of the committee, (2) the committee members' relationship with the corporation's officers and directors, (3) the committee members' qualifications and experience, and (4) the scope of the committee's authority, and (5) the committee's autonomy from the directors, officers, and corporate counsel." *Lewis*, 838 S.W.2d at 224. Although McLaren was the only member of the committee, that fact alone is not determinative of the committee's independence and constitutes but a single factor to consider. After his appointment, McLaren secured the services of an accounting firm to assist him in his investigation. At the hearing on Ram-Tenn's motion to confirm the report, McLaren testified that he relied significantly and extensively on the findings of the members of the accounting firm in reaching his decision. In *Brady v. Calcote*, we held that a committee comprised of an attorney and a certified public accountant was large enough to satisfy the independence requirement. *Brady*, 2005 Tenn. App. LEXIS 8, at *9. We are not prepared to say that a special litigation committee comprised of a single individual will never be found to be independent. As we stated in *Lewis*, when evaluating a special litigation committee's independence, the size of the committee is but a single factor among many a court is to consider. *Lewis*, 838 S.W.2d at 224.

McLaren further testified that he had no personal or business relationship with Edmondson, House, or Ram-Tenn prior to his involvement in this case. McLaren has been a licensed attorney for twenty-six years focusing his practice in the area of commercial litigation. The corporate resolution appointing McLaren vested him with the full authority to investigate the charges leveled by House and, using his independent business judgment, ascertain whether the litigation should be continued, dismissed, or settled. At one of the hearings conducted below, counsel for House noted that he had no reason to object to the appointment of McLaren. There is ample proof in the record to support the trial court's conclusion that the special litigation committee remained independent. Moreover, nothing in the record before this Court warrants a holding contrary to the trial court's conclusion that McLaren acted in good faith in conducting his investigation.

It would seem that House confines his arguments on appeal to whether the record supports the trial court's conclusion that McLaren acted with procedural fairness and that his conclusions and recommendations are sound. When reviewing whether a special litigation committee exhibited procedural fairness and adequately investigated the allegations of a complaining shareholder, the trial court should consider the following: "(1) the length and scope of the investigation, (2) the committee's use of independent counsel or experts, (3) the corporation's or the defendants'

involvement, if any, in the investigation, and (4) the adequacy and reliability of the information supplied to the committee." *Lewis*, 838 S.W.2d at 224.

As to the procedure employed by McLaren, House apparently argues that McLaren's decision to limit his review of Ram-Tenn's records to the year 1994 forward demonstrates procedural unfairness in this case. House contends that, had the investigation been broadened by going back to 1977, McLaren would have been able to discover larger sums misappropriated by Edmondson.

In Section 5 of his original report, McLaren noted House's contentions regarding the scope of the investigation, and he addressed these concerns by stating:

> The issue, in lay terms for the Board, is whether there was fraudulent concealment which would allow House and/or Ram-Tenn to pursue Edmondson all the way back to 1977 for misappropriations, or, whether the three (3) year statute of repose found at T.C.A. 48-18-601 controls and any inquiry is limited to the last three (3) years (with a possible 1 year extension for concealment).

In concluding his original report, McLaren stated:

> After a great deal of work on this matter, some definite conclusions can be drawn:
>
> . . . .
>
> 3.    That little or no effort was made to conceal the misappropriations, and the sums misappropriated would have been apparent to anyone reviewing the books, accounts, and records, including checking accounts, of Ram-Tenn.
> 4.    That Edmondson and House are both extremely sophisticated hotel/motel businessmen, familiar with all aspects of that business.
> 5.    That House, in particular, is and has been an extremely sophisticated and knowledgeable businessman and shareholder of Ram-Tenn.
> 6.    That little or no effort was made by <u>any</u> shareholder to monitor or even inquire as to the affairs of Ram-Tenn, Inc., until shortly before the subject lawsuit was filed.
> 7.    That Edmondson was given complete and total authority to run and operate Ram-Tenn completely unfettered by shareholder questions, concerns or inquiries, until the subject lawsuit was filed.

. . . .

10. That very few corporate formalities were followed with respect to the books, accounts and records of Ram-Tenn.

11. That House (or any other shareholder) in the exercise of any due diligence, could have ascertained the nature and extent of Edmondson's misappropriations at any time.

In deciding to limit his inquiry to the four years preceding House's complaint, or the year 1994 forward, McLaren apparently applied a three year statute of limitations and added an additional year for any concealment.

House argues that the following statute of limitations applies in this case:

The following actions shall be commenced within ten (10) years after the cause of action accrued:
(1) Actions against guardians, executors, administrators, sheriffs, clerks, and other public officers on their bonds;
(2) Actions on judgments and decrees of courts of record of this or any other state or government; and
(3) *All other cases not expressly provided for.*

TENN. CODE ANN. § 28-3-110 (2000) (emphasis added). The legislature provides that any action alleging a breach of fiduciary duty by a director or officer of a corporation

must be brought within one (1) year from the date of such breach or violation; provided, that in the event the alleged breach or violation is not discovered nor reasonably should have been discovered within the one-year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered. In no event shall any such action be brought more than three (3) years after the date on which the breach or violation occurred, except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after the alleged breach or violation is, or should have been, discovered.

TENN. CODE ANN. § 48-18-601 (2002). Thus, the legislature has expressly provided the limitations period applicable to cases of this nature, therefore, the limitations period set forth in section 28-3-110 does not apply. *See* TENN. CODE ANN. § 28-3-110(3) (2000).

Regarding fraudulent concealment, our supreme court has stated as follows:

The equitable doctrine of fraudulent concealment is based upon the principle of fair dealing. Where there is no dealing between the parties there can be no concealment. And even where the parties have had business transactions it is universally held that mere silence does not constitute fraudulent concealment. We have been unable to find any case like the one under consideration where the rule contended for was applied.

In 12 Ruling Case Law, p. 306, it is said: "As a general rule to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts. There must be a concealment, and the silence must amount to fraud. Concealment in this sense may consist in withholding information asked for, or in making use of some device to mislead, thus involving act and intention. The term generally infers also that the person is in some way called upon to make a disclosure. It may be said, therefore, that, in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them."

*Patten v. Standard Oil Co. of La.*, 55 S.W.2d 759, 761 (Tenn. 1933); *see also Soldano v. Owens-Corning Fiberglass Corp.*, 696 S.W.2d 887, 889 (Tenn. 1985).

The evidence in the record does not preponderate against the findings set forth in McLaren's report relating to his decision to limit his inquiry to a four year period, which were affirmed by the trial court. Moreover, House testified that he never asked for an annual meeting of the Ram-Tenn board of directors and never asked to see any of the corporation's financial records prior to 1997. Thus, we cannot say that McLaren erred in confining his evaluation to the four year period preceding House's complaint.

House also takes issue with the procedure used by McLaren in calculating the amount misappropriated by Edmondson from 1994 forward, arguing that McLaren did not consider all of the misappropriations engaged in by Edmondson during that period. At the hearing below, McLaren testified as follows:

The records of Ram-Tenn are not kept in a sophisticated fashion and I believe I got everything there was to get. I believe I looked at all documents or the accounting firm looked at all the documents that were necessary to make a judgment, but early on, I made a judgment call when analyzing this case that if we could not find a document to support an expense, we would assume that that should be held against Mr. Edmondson, so I would say the sufficiency

of the documents was adequate to support the report with that caveat, but we couldn't find a document. If there was a check that went out that was unsupported by an invoice, I instructed the accountants to hold it against Mr. Edmondson and put that in the repayment column.

Mr. House's documents were likewise helpful. There was more conclusory information than raw data, but the raw data he had used had come from Ram-Tenn by and large, so between the two of them, I think the documents were adequate to support this report.

Since McLaren charged the lack of documentation to justify an expenditure against Edmondson, we cannot say that McLaren acted unfairly toward House in evaluating the corporate records in this manner. McLaren's report and supplemental report thoroughly documented the basis for the amount of misappropriation he charged to Edmondson, and we find nothing in the record to preponderate against those findings.

Regarding the adequacy of McLaren's investigation, the record establishes that he employed an accounting firm to assist him at a cost to Ram-Tenn of approximately $50,000 to $60,000. Further, his law firm expended approximately 313 hours performing the investigation at a cost of approximately $70,000 to Ram-Tenn. The report and supplemental report filed by McLaren setting forth the justifications for his findings is quite extensive, spanning in excess of fifty pages.

Finally, we turn to the trial court's decision regarding the soundness of McLaren's recommendations. A trial court should not limit its review to the procedures utilized by the special litigation committee in reaching its decision, but should consider the rationale for that decision as well. *Lewis ex rel. Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215, 224 (Tenn. Ct. App. 1992). When ascertaining whether the special litigation committee reached a reasoned and principled decision, the trial court should consider the following: "(1) the likelihood that the plaintiff will succeed on the merits, (2) the possible financial burden on the corporation compared with the litigation costs, (3) the extent to which dismissal will permit the defendants to retain improper benefits, and (4) the effect continuing the litigation will have on the corporation's business reputation and good will." *Id.* at 224–25 (citing *Houle v. Low*, 556 N.E.2d 51, 59 (Mass. 1990)). We are also mindful that "Tennessee's courts have consistently followed a noninterventionist policy with regard to internal corporate matters." *Id.* at 220 (citing *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988)); *see also Wallace v. Lincoln Sav. Bank*, 15 S.W. 448, 449–50 (Tenn. 1891)). When reviewing the recommendation of a special litigation committee, the trial court must stop short of substituting its own business judgment for that of the committee. *Lewis*, 838 S.W.2d at 224.

House contends that a larger amount could have been recovered from Edmondson if he were allowed to proceed with his derivative action. If the corporation were to proceed with the litigation, it may not be able to recover the entire $552,501.61 found to have been misappropriated by Edmondson. While Edmondson agreed to the settlement, a trial could very well result in the recovery of a lesser amount, especially since McLaren charged Edmondson with all items for which he could not locate the appropriate documentation. While McLaren extended his evaluation to the

four years preceding the complaint filed by House, Edmondson could very well assert the statute of limitations found in section 48-18-601 of the Tennessee Code if the case were tried, bringing into question items charged to Edmondson during the period of time utilized by McLaren. Moreover, the costs of litigating the case would only add to the legal fees already incurred by the corporation in investigating the complaint filed by House. When presenting his report to the Ram-Tenn board of directors, McLaren outlined many of these concerns for the board's consideration. The record supports the trial court's finding that McLaren's recommendation represented a reasoned and sound decision.

After reviewing the record, we cannot say that the trial court failed to carry out its function in an appropriate manner pursuant to our holding in *Lewis*. Accordingly, we hold that Ram-Tenn met its burden of proving the necessary elements required by *Lewis*, and we affirm the trial court's decision to approve the report of the special litigation committee.

### *B.*
### *Attorney's Fees*

In its order approving the report and supplemental report issued by the special litigation committee, the trial court held: "Pursuant to T.C.A. Section 48-17-401, attorney's fees are not available to a successful Plaintiff in a shareholder's derivative proceeding involving a 'for profit' corporation." On appeal, House argues that the trial court's ruling constitutes error. At the outset, House acknowledges the well established rule in this state that litigants, absent a statute or agreement to the contrary, are responsible for their own attorney's fees and litigation expenses. *See State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000) (noting that this state adheres to the "American Rule," which requires that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise"); *Goings v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 847, 848 (Tenn. Ct. App. 1972) ("In the absence of a statutory provision therefor, or contractual agreement between the parties, attorney fees incurred by a plaintiff in recovering a judgment for damages is not a proper element of damages and the allowance of such is contrary to the public policy of Tennessee.").

The section of the Tennessee Code governing a shareholder's derivative action on behalf of a for-profit corporation provides as follows: "On termination of the proceeding, the court may require the plaintiff to pay any defendant's reasonable expenses (including counsel fees) incurred in defending the proceeding if it finds that the proceeding was commenced without reasonable cause." TENN. CODE ANN. § 48-17-401(d) (2002). Nowhere in the statutes governing for-profit corporations does the legislature provide for the award of attorney's fees to the shareholder bringing the derivative action. House contends that "Tennessee has long held that recoveries such as the one caused by the efforts of House merit the award of fees under a common fund theory." (Appellant's Br. at 34).

In support of his contention, House cites to this Court's opinion in *Hannewald v. Fairfield Cmtys., Inc.*, 651 S.W.2d 222 (Tenn. Ct. App. 1983). In *Hannewald*, a derivative action, this Court

was asked to interpret former section 48-718 of the Tennessee Code, which provided: "If the suit is successful, in whole or in part, or if anything is received by the corporation for profit as a result thereof, the court may award the complainant or complainants reasonable expenses and reasonable attorneys' fees . . . ." *Id.* at 229. We stated that "[w]e feel that attorney's fees are made available in successful derivative suits to encourage and assist shareholders or members in pursuing justified claims for the benefit of corporations in which they have a valid interest." *Id.* at 230. House's reliance on *Hannewald* to support his position on appeal, however, is misplaced. *Hannewald* was decided in 1983 prior to the current version of the Tennessee Business Corporation Act, which the legislature enacted in 1986. *See* 1986 TENN. PUB. ACTS ch. 887, § 7.40. Unlike the statute at issue in *Hannewald*, the statute applicable to this case does not permit a court to award of attorney's fees and litigation expenses to the complainant in a shareholder's derivative action. *See* TENN. CODE ANN. § 48-17-401(d) (2002); ***Brady v. Calcote***, No. M2003-01690-COA-R3-CV, 2005 Tenn. App. LEXIS 8, at *26 n.9 (Tenn. Ct. App. Jan. 11, 2005) (no perm. app. filed).[2] As such, House cannot rely on this Court's decision in *Hannewald* to secure payment of his attorney's fees.

House also argues that he is entitled to recover his attorney's fees pursuant to the "common fund doctrine." We recently had occasion to address this doctrine, stating:

> [T]he "common fund doctrine" is an equitable concept designed to prevent unjust enrichment. Tennessee courts have recognized the common fund doctrine in those circumstances where more than one party and counsel have contributed to securing a single judgment that inures to the benefit of all the parties. In such situations, the common fund doctrine may be applied to determine the allocation of fees and expenses. *See PST Vans, Inc. v. Reed*, 1999 Tenn. App. LEXIS 861, Nos. 03 A01-9901-CV-00113 and E1999-01963-COA-R3-CV, 1999 WL 1273517 at *3 (Tenn. Ct. App. Dec. 28, 1999) (no Tenn. R. App. P. 11 application filed). Essentially, the common fund doctrine is an exception to the general rule that attorneys may look only to the clients with whom they contract for compensation. It provides that "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Hobson v. First State Bank*, 801 S.W.2d 807, 809 (Tenn. Ct. App. 1990) (quoting *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977)).
> Our Supreme Court has recognized the doctrine:

---

[2] It is interesting to note that, regarding the solicitation of charitable funds by nonprofit corporations, the legislature provided as follows: "Upon a finding by the court that a provision of this part has been violated, the court may award to the person bringing such action attorney's fees and costs." TENN. CODE ANN. § 48-101-520(f) (2002).

There are, of course, many situations in which the work of an attorney proves useful to persons other than his own client. The normal rule in such cases is that he must look only to his client, with whom he has contracted, for his compensation, notwithstanding the acceptance of benefits by others. But, an exception to this rule is made whenever one person, having assumed the risks and expense of litigation, has succeeded in securing, augmenting, or preserving property or a fund of money in which other people are entitled to share in common. In that event, the expenses of the action are borne by each participant according to his interest. The fairest and most efficient means of distributing these costs is thought to be to make them a charge upon the fund itself. This device, known as the 'fund doctrine,' was invented by courts of equity to prevent passive beneficiaries of the fund from being unjustly enriched. It is, therefore, never applied against persons who have employed counsel on their own account to represent their interests. Thus, the right to employ counsel of one's own choosing is preserved.

*Travelers Ins. Co.*, 541 S.W.2d at 589-90 (citations omitted).

In *Travelers*, the court implied, without specifically holding, that the common fund doctrine may apply to actions involving an injured party and the insurer subrogee, on the basis that the subrogee becomes a real party in interest in an action against the party causing the injury. *Hobson v. First State Bank* involved payment of attorney fees in a class action lawsuit, and this court determined that the attorneys for the class were entitled to recover their fees from the common fund or, in effect, from all class members, including those represented by other counsel. *See Hobson*, 801 S.W.2d at 812. Damages recovered in a class action on behalf of a class of plaintiffs unquestionably constitute a "common fund." Tennessee courts have also applied the common fund doctrine to damages in a wrongful death action where more than one party has a statutorily-created claim. *See Wheeler v. Burley*, 1997 Tenn. App. LEXIS 578, No. 01 A01-9701-CV-00006, 1997 WL 528801 at *4-5 (Tenn. Ct. App. Aug. 27, 1997) (perm. app. denied Apr. 13, 1998); *In re Estate of Stout*, 1994 Tenn. App. LEXIS 345, No. 01 A01-9308-CH-00360, 1994 WL 287765 at *4 (Tenn. Ct. App. June 29, 1994) (no Tenn. R. App. P. 11

application filed); *PST Vans, Inc. v. Reed*, 1999 WL 1273517 at *5; *Spivey v. Anderson*, 1997 Tenn. App. LEXIS 616, No. 02 A01-9704-CV-00075, 1997 WL 563199 [*22] at *5 (Tenn. Ct. App. Sept. 9, 1997) (no Tenn. R. App. P. 11 application filed).

We are unaware of any other situation in which Tennessee courts have applied the common fund doctrine.

*Martino v. Dyer*, No. M1999-02397-COA-R3-CV, 2000 Tenn. App. LEXIS 764, at *18–22 (Tenn. Ct. App. Nov. 22, 2000) (no perm. app. filed). House does not cite this Court to any authority holding that a complaining shareholder in a shareholder's derivative action may recover his or her attorney's fees under the "common fund doctrine," and our own independent research has failed to discover any pronouncement to that effect from any court in this state.

The legislature has expressly set forth those instances when attorney's fees are warranted in a shareholder's derivative action involving a for profit corporation. *See* Tenn. Code Ann. § 48-17-401(d) (2002). The express language of the statute does not allow for the award of attorney's fees under the facts present in this case. Accordingly, we affirm the trial court's decision to deny House's request for attorney's fees.

### C.
### *Breach of the Pre-Incorporation Agreement*

In his complaint filed on April 12, 1999, House asserted what appeared to be a direct cause of action against Edmondson for breach of the Pre-Incorporation Agreement. Therein, House stated that he "just recently learned that in apparent violation of the terms of the pre-incorporation and the restriction placed on each shareholder of stock, Edmondson has acquired shares of Ram-Tenn without first offering them to Ram-Tenn or House and/or the other shareholders of Ram-Tenn."

In his initial report, McClaren addressed this aspect of House's complaint, stating:

> J.K. Edmondson initially acquired 25 shares of Ram-Tenn at the formation of the corporation on May 15, 1968. . . . The first stock transfer occurred on September 16, 1968 when J.K. Edmondson bought 55 shares of Ram-Tenn bringing his total shares to 135 and/or a 42% interest, as evidenced by Stock Certificate #11. . . .
> The next stock transfer occurred on January 1, 1971, when Edmondson, bought 16 shares of Ram-Tenn, evidence by Stock Certificate #24. . . . The very next month, February 2, 1971, the Defendant purchased 16 more shares of Ram-Tenn stock, evidenced by Stock Certificate #20, bringing his total shares to 167. . . .
> The following year, on January 3, 1972, under Stock Certificate #25, the Defendant purchased 54.4 shares, bringing his

-15-

total interest to 221.4 shares. . . . Sixteen years later, the Defendant purchased 32 shares bringing his total shares to 253.4 . . . . Currently, the Defendant, Edmondson is a 62% majority owner of Ram-Tenn.

If Edmondson was aware that the stock had not first been offered to the corporation as per the shareholders agreement, and we can assume he was, then the transfers to Edmondson could be perceived as improper. However, under Tennessee law, corporations are required to hold a shareholders meeting at least annually. These meetings are to be held after proper notice has been given and a record has been set. If no meeting is held within six months after the end of a corporations fiscal year, of if fifteen months have passed since the last shareholder meeting, then any shareholder may request that a court order a meeting. See T.C.A. § 48-17-101 and 103. . . . The shares which Edmondson purchased, allowing him to acquire 62% ownership of the corporation, were sold to him anywhere from 12-32 years ago. In that time period, shareholder meetings *were probably held*, albeit informally, where it *must have been apparent*, based on the nature of this closely held corporation, that Edmondson had acquired the majority of the shares. Any time an issue was voted, Edmondson controlled the corporation. In the event <u>no</u> meetings were ever held, shareholders could have but did not request a meeting, nor did any shareholders invoke T.C.A. § 48-17-101 and 103, to seek a meeting.

Therefore, either Mr. House acquiesced to Edmondson's purchase (which were always signed by Mr. Heath (House's partner) and Edmondson as president of Ram-Tenn), or else for roughly thirty-years, House slept on his rights, never called a shareholders meeting, or else never attended meetings, but did not object to Edmondson's control or acquisitions.

. . . .

House *probably knew* of Edmondson's acquisition of the shares . . . and that Edmondson was the majority shareholder, but House did not object until grounds for a grievance arose between the two shareholders.

(emphasis added).

Edmondson subsequently moved for summary judgment on House's direct claim for breach of the Pre-Incorporation Agreement. In support of his motion, Edmondson supplied a statement of undisputed facts which referenced certain documents attached to an earlier affidavit supplied by counsel for Ram-Tenn. These documents tended to indicate that as early as January of 1971 and

extending to August of 1985, House received notice that Edmondson was acquiring additional Ram-Tenn stock.[3]  In response to Edmondson's motion for summary judgment, House filed a motion for partial summary judgment on his direct claim against Edmondson.  In support of his motion, House submitted his own affidavit stating that he never received notice of and did not consent to any transfer of stock to Edmondson by other shareholders.  It appears that the last stock transfer to Edmondson occurred in 1988.  Relying on the aforementioned documents, Edmondson argues that the record conclusively establishes that House had notice of his acquisition of additional shares of stock as early as 1971.  Further, since the last stock transfer occurred in 1988 and House did not file his claim until 1999, Edmondson asserts that the direct claim filed by House is barred by the applicable statute of limitations, whether it be the statute of limitations for breach of contract or for breach of fiduciary duty.

When reviewing a trial court's grant or denial of summary judgment, we employ the following standard of review:

> The standards for reviewing summary judgments on appeal are well settled.  Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone.  *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Church v. Perales*, 39 S.W.3d 149, 156 (Tenn. Ct. App. 2000).  They are not, however, appropriate when genuine disputes regarding material facts exist.  Tenn. R. Civ. P. 56.04.  Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion — that the party seeking the summary judgment is entitled to a judgment as a matter of law.  *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001).

---

[3] In his statement of undisputed facts, Edmondson also asserted that he purchased thirty-two (32) shares of a deceased shareholder's stock at a foreclosure sale in 1985.  Edmondson asserted that House was given the opportunity along with the other shareholders to purchase a proportionate share of the stock, but he declined to do so.  The documents relied upon by Edmondson, which were supplied by counsel for Ram-Tenn as well, tended to support this assertion.  In his affidavit filed in support of his own motion for partial summary judgment, House stated: "While J.O. House does not concede and in fact contests the transfer of the [deceased shareholder's] stock to J.K. Edmondson, he is entitled to judgment as a matter of law that the transfers of the above stated stock was [sic] made without notice to House and the corporation."

In his brief filed on appeal, House, when reciting the statements in his affidavit, states: "The record is devoid of any evidence to show as a matter of law that House's statements about the stock transfers to Edmondson other than the [deceased shareholder] transaction were false."  We take this to mean that House does not contest that he received notice of Edmondson's acquisition of the thirty-two (32) shares of stock involved in that transaction.  If House acquiesced to this transfer, which he appears to concede in his brief, then that transfer necessarily would not constitute a breach of the Pre-Incorporation Agreement.

-17-

Summary judgments enjoy no presumption of correctness on appeal. *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001).

**Summers v. Cherokee Children & Family Servs., Inc.**, 112 S.W.3d 486, 507–08 (Tenn. Ct. App. 2002).

Our supreme court has established that "[s]hareholders may bring derivative and individual actions simultaneously. While there is always theoretical conflict of interest, the great weight of authority rejects a *per se* rule prohibiting such representation." **Hall v. Tenn. Dressed Beef Co.**, 957 S.W.2d 536, 540 (Tenn. 1997) (citation omitted); **see also Hadden v. City of Gatlinburg**, 746 S.W.2d 687, 689 (Tenn. 1988) ("Stockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer."); **Franklin Capital Assocs., L.P. v. Almost Family, Inc.**, No. M2003-02191-COA-R3-CV, 2005 Tenn. App. LEXIS 748, at *17 n.6 (Tenn. Ct. App. Nov. 29, 2005) (no perm. app. filed) ("As one commentator has observed, 'if the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action.'").

The trial court's order addressing this issue merely granted Edmondson's motion for summary judgment and denied House's motion for partial summary judgment. Thus, we are unable to ascertain the precise manner in which the trial court approached this claim. To the extent that House's direct claim against Edmondson alleges a breach of fiduciary duty by Edmondson, the following statute of limitations is applicable:

Any action alleging breach of fiduciary duties by directors or officers, including alleged violations of the standards established in § 48-18-301, § 48-18-302 or § 48-18-403, must be brought within one (1) year from the date of such breach or violation; provided, that in the event the alleged breach or violation is not discovered nor reasonably should have been discovered within the one-year period, the period of limitation shall be one (1) year from the date such was discovered or reasonably should have been discovered. *In no event*

-18-

*shall any such action be brought more than three (3) years after the date on which the breach or violation occurred, except where there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year after the alleged breach or violation is, or should have been, discovered.*

TENN. CODE ANN. § 48-18-601 (2002) (emphasis added).

The last stock acquisition by Edmondson occurred in 1988, and House filed his complaint in 1999. In order to create a genuine issue of material fact as to whether his claim was barred by the statute of limitations in section 48-18-601 of the Tennessee Code, House needed "to set forth specific facts, not legal conclusions, by using affidavits or the discovery materials listed in Rule 56.03, establishing that there are indeed disputed, material facts creating a genuine issue that needs to be resolved by the trier of fact and that a trial is therefore necessary." ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993). Upon reviewing the record, we find no instance where House made an allegation or presented any evidence regarding his direct claim against Edmondson that tended to show that Edmondson fraudulently concealed his acquisition of stock from the other shareholders. Thus, insofar as the trial court impliedly relied on this statute of limitations to conclude that Edmondson was entitled to summary judgment as a matter of law, we find no error.

House appears to have framed his cause of action against Edmondson primarily as a claim for breach of contract. By signing the Pre-Incorporation Agreement, the shareholders of Ram-Tenn entered into a contract. ***See, e.g., Tipton v. Mill Creek Gravel, Inc.***, 373 F.3d 913, 917 (8th Cir. 2004). The statute of limitations for breach of contract is six years after the cause of action accrued. TENN. CODE ANN. § 28-3-109(a)(3) (2000).

This Court recently addressed the statute of limitations applicable to breach of contract claims in ***Goot v. Metropolitan Government of Nashville and Davidson County***, No. M2003-02013-COA-R3-CV, 2005 Tenn. App. LEXIS 708 (Tenn. Ct. App. Nov. 9, 2005), *no appeal filed*. *Goot* involved a dispute between the surviving spouses of five disabled city employees and the Metropolitan Government of Nashville and Davidson County ("Metro") over the exact amount of life insurance benefits to be paid following the employees' deaths. *Id.* at *1. Metro provided group life insurance benefits to its employees. *Id.* at *3. Metro paid the premiums for the policy while the insurance company determined who was eligible for coverage and processed the claims. *Id.* The group policy provided active city employees with coverage equal to twice their annual salary up to a maximum benefit of $50,000. *Id.* at *3–4. Former employees who received disability or service pension could receive coverage up to $7,500 under the group policy. *Id.* at *4. Further, the group policy contained a waiver of premium provision that allowed employees who became disabled, as defined by the policy, to maintain their life insurance coverage at the same level as active employees. *Id.* Thus, the life insurance proceeds payable to the spouses of eligible employees differed significantly depending on whether the employee had asserted the waiver of premium benefit under the policy. *Id.* at *5.

Five Metro employees became disabled and took a disability retirement between 1985 and 1996. *Id.* When each of the employees died, their respective spouses each received approximately $7,500 in life insurance proceeds. *Id.* at *5–6. The spouses subsequently discovered that, had their deceased spouses qualified for the waiver of premium benefit, they would have received a much larger death benefit. *Id.* at *6. On July 18, 2001, the surviving spouses filed individual lawsuits against Metro asserting that Metro breached its contractual duty to their husbands by concealing and failing to inform them of the provisions in the policy. *Id.* at *8. The trial court empaneled a jury to hear the plaintiffs' breach of contract claims, but the court granted Metro's motion for a directed verdict against three of the plaintiffs at the close of their proof. *Id.* at *12. Metro subsequently filed motions for summary judgment as to the breach of contract claims filed by the two remaining plaintiffs, and the trial court granted both motions. *Id.* at *12–13. As for one of these two plaintiffs, the trial court concluded that she could not proceed with her breach of contract claim as a matter of law because it was barred by the applicable statute of limitations. *Id.*

On appeal, the plaintiff who had her claim dismissed based upon the running of the statute of limitations argued that the discovery rule should apply to her breach of contract claim. *Id.* at *31. Writing for the Middle Section of this Court, Judge Koch began by noting that "[t]he Tennessee Supreme Court has yet to address whether the discovery rule may apply to breach of contract claims and, if so, the circumstances warranting its application." *Id.* at *34. In deciding to directly address the issue, the Court stated:

> As a general matter, there will be little need for the discovery rule in most breach of contract cases. A buyer is immediately aware of a breach upon the delivery of nonconforming goods, and a seller knows of the breach when payment is delinquent. However, it is not difficult to envision circumstances in which a party to a contract would not be aware that the other party has breached the contract. In those circumstances, just as in tort claims involving personal injuries, it would be unjust to hold that a plaintiff's claim for breach of contract accrues before the plaintiff knew or should have known that the contract had been breached.
>
> Many courts now apply the discovery rule to breach of contract claims and hold that a cause of action for breach of contract begins to run when a party either discovers the breach or could have or should have discovered the breach through the exercise of reasonable judgment. 31 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 79:14, at 304 (Richard A. Lord ed., 4th ed. 2004) [hereinafter WILLISTON ON CONTRACTS]. These courts have invoked the discovery rule in cases where (1) the breach of contract was difficult for the plaintiff to detect, (2) the defendant was in a far superior position to comprehend the breach and the resulting damage, or (3) the defendant had reason to believe that the plaintiff remained ignorant that it had been wronged. *El Pollo Loco,*

> *Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003). Stated another way, the discovery rule applies in cases where the breach of contract is inherently undiscoverable. *April Enters., Inc. v. KTTV*, 195 Cal. Rptr. at 437; *J.M. Krupar Constr. Co. v. Rosenberg*, 95 S.W.3d 322, 329 (Tex. App. 2002).

*Id.* at *38–40 (footnotes omitted). A breach of contract is "inherently undiscoverable"

> when the injured party is unlikely to discover the wrong during the limitations period despite due diligence. To be inherently undiscoverable, the wrong and injury must be unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff. *In re Coastal Plains, Inc.*, 179 F.3d 197, 214-15 (5th Cir. 1999).

*Id.* at *40 n.31.[4] Based upon this reasoning, we concluded that "neither [the plaintiff] nor her husband were aware of the waiver of premium benefit in 1987 when her husband qualified for disability retirement." *Id.* at *41. She did not discover the existence of the waiver of premium benefit until July 1998 when she filed for a claim under the policy at her husband's death. *Id.* at *42. Since she filed her lawsuit in 2001, within six years of discovering the alleged breach, we concluded that the trial court erred in granting Metro's motion for summary judgment. *Id.* at *42–43.

"Ordinarily, the question of whether a plaintiff knew or should have known that a cause of action existed is a question of fact, inappropriate for summary judgment." ***City State Bank v. Dean Witter Reynolds, Inc.***, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) (citing ***Prescott v. Adams***, 627 S.W.2d 134, 139 (Tenn. Ct. App. 1981)); *see also **Fite v. Fite***, No. 02A01-9710-CH-00266, 1999 Tenn. App. LEXIS 307, at *20 (Tenn. Ct. App. May 19, 1999), *no appeal filed* ("In general, the inquiry of when a plaintiff knew of or should have discovered a cause of action is a question of fact not properly decided on summary judgment."). "[T]here is ample authority for the proposition that whether a plaintiff discovered, or in the exercise of reasonable diligence, should have discovered an injury resulting from a defendant's act creates a genuine issue of fact, precluding disposition by summary judgment." ***City State Bank***, 948 S.W.2d at 735 (citations omitted).

We are cognizant of the fact that the trial court did not have the benefit of our decision in *Goot* when it rendered a decision on this issue below. In light of our decision in *Goot*, however, we find that a genuine issue of material fact exists as to whether House may avail himself of the

---

[4] This Court noted "at least two circumstances in which the invocation of the discovery rule would be improper, even when the breach of contract is inherently undiscoverable." *Id.* at *40. The first is when the discovery rule is inconsistent with the terms of the applicable statute of limitations. *Id.* In *Goot*, this Court was dealing with the same statute of limitations applicable to the instant case, therefore, this exception does not apply. Next, "the discovery rule cannot supercede a contractually agreed upon limitations period as long as the agreed upon period affords a reasonable time within which to file suit." *Id.* As the parties' contract in this case contains no such agreement, this exception is inapplicable as well.

discovery rule in regards to his claim for breach of the Pre-Incorporation Agreement. In support of his motion for summary judgment, Edmondson relied on documents held by counsel for Ram-Tenn, which he argued conclusively established that House knew of his acquisition of stock as early as 1971. In response, House submitted his own affidavit stating that he had no knowledge of Edmondson's acquisition of the additional stock, presumably until he began examining the corporation's records in 1997. House also expressly asserted that he never received any notice of Edmondson's acquisition of any additional stock. By stating that he never received notice of the stock transfers, we must draw an inference in House's favor and conclude that he is questioning the authenticity of the documents or that he is denying receipt of the documents. Stated differently, in light of the documentary evidence offered by Edmondson in support of his motion for summary judgment, we must take House's blanket statement that he received no notice to mean that he denies ever seeing the documents at issue. Resolution of this issue may very well hinge upon the credibility assigned by the trier-of-fact.

We also are mindful that House's diligence in discovering the breach is a factor to consider. Edmondson offered no evidence in support of his motion for summary judgment tending to provide House's lack of diligence.[5] We do find some evidence in the record addressing House's diligence in discovering the breach of the Pre-Incorporation Agreement. In his report, McLaren stated: "shareholder meetings *were probably held* . . . where it *must have been apparent* . . . that Edmondson acquired the majority of the shares" and that "House *probably knew* of Edmondson's acquisition of the shares." (emphasis added). McLaren, however, does not provide the factual basis for these assertions. In fact, the very language used by McLaren suggests that these assertions merely encompass his personal opinions concerning House's level of diligence in this case. Thus, based on the statements by McLaren in his report, the due diligence exercised by House in attempting to discover Edmondson's acquisition of additional stock remains a disputed issue of material fact.

Granted, House may face difficulty when attempting to prove his lack of notice at trial, but an issue of fact as to his knowledge of Edmondson's acquisition of additional stock remains nonetheless. For our purposes here, we must take the evidence offered by House to be true and draw all reasonable inferences from such evidence in his favor. *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). When the authenticity of documentary proof, the weight to be given to certain evidence, or the credibility of the witnesses are at issue, summary judgment is not appropriate. *Id.* at 216. "The purpose of a summary judgment proceeding is not the finding of facts, the resolution of disputed, material facts, or the determination of conflicting inferences reasonably to be drawn from those facts." *Id.* It is to resolve an issue of law. *Id.*

A breach is "inherently undiscoverable," and will thereby trigger the application of the discovery rule, "when the injured party is unlikely to discover the wrong during the limitations period despite due diligence." *Goot v. Metro. Gov't of Nashville & Davidson County*, No. M2003-02013-COA-R3-CV, 2005 Tenn. App. LEXIS 708, at *40 n.31 (Tenn. Ct. App. Nov. 9, 2005), *no

---

[5] Edmondson necessarily would forego presenting such evidence without having the benefit of our decision in *Goot* applying the discovery rule to breach of contract actions.

*appeal filed*. We must presume that House did not have knowledge of Edmondson's acquisition of additional stock in violation of the Pre-Incorporation Agreement until he investigated the records of the corporation in 1997. Whether House acted with due diligence prior to 1997 remains a question of fact to be resolved at trial. Accordingly, we reverse the trial court's grant of summary judgment to Edmondson on House's direct claim for breach of contract, and we remand this case to the trial court for further proceedings on this claim.

## III.
### CONCLUSION

For the aforementioned reasons, we affirm the trial court's decision to approve the special litigation committee's report pursuant to our decision in ***Lewis ex rel. Citizens Sav. Bank & Trust Co. v. Boyd***, 838 S.W.2d 215 (Tenn. Ct. App. 1992). We also affirm the trial court's decision to deny the Appellant's request for attorney's fees. Regarding the trial court's grant of summary judgment to the Appellee, J.K. Edmondson, we must reverse that decision and remand the case to the trial court for further proceedings as a genuine issue of material fact remains as to whether the Appellant's direct claim against Edmondson is barred by the statute of limitations applicable to breach of contract claims. The costs associated with this appeal are to be taxed one-half to the Appellant, J.O. House, and his surety, and one-half to the Appellee, J.K. Edmondson, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE